1  Beth E. Terrell, WSBA #26759
   Jennifer R. Murray, WSBA #36983
2  Elizabeth A. Adams, WSBA #49175
   Terrell Marshall Law Group PLLC
3  936 North 34th Street, Suite 300
   Seattle, Washington 98103
4  Telephone: (206) 816-6603
   Facsimile: (206) 319-5450
5  Email: bterrell@terrellmarshall.com
   Email: jmurray@terrellmarshall.com
6  Email: eadams@terrellmarshall.com

7  [Additional Counsel Appear On Signature Page]

8              UNITED STATES DISTRICT COURT FOR THE
                  EASTERN DISTRICT OF WASHINGTON
9

10  CYNTHIA HARVEY and STEVEN A.
    MILMAN, individually and on behalf of        NO.
    all others similarly situated,
11
                                                 **COMPLAINT – CLASS ACTION**
                      Plaintiffs,
12                                               **DEMAND FOR JURY TRIAL**

13         v.

14  CENTENE CORPORATION,
    COORDINATED CARE
15  CORPORATION, and SUPERIOR
    HEALTHPLAN, INC.,

16                    Defendants.

17

18        Plaintiffs Cynthia Harvey ("Harvey") and Steven A. Milman ("Milman")

19  (together, "Plaintiffs") bring this class action pursuant to Federal Rule of Civil

20  Procedure 23(a), (b)(2), and (b)(3), individually and on behalf of all similarly-

COMPLAINT – CLASS ACTION - 1

1  situated persons, who were or are Ambetter policyholders from January 11, 2012

2  to the present, against defendants Centene Corporation ("Centene"), Coordinated

3  Care Corporation ("Coordinated Care") and Superior HealthPlan, Inc. ("Superior

4  Health") (collectively, "Defendants"). Plaintiffs' allegations are based on

5  information and belief, except for the allegations concerning Plaintiffs' own

6  circumstances.

7  **I. PARTIES**

8      1.      Plaintiff Cynthia Harvey is an individual residing in Spokane,

9  Washington. Ms. Harvey bought Centene's Ambetter Health Insurance Policy,

10  Silver Metal type, from its Washington subsidiary Coordinated Care on the

11  Washington Benefit Health Exchange in December 2016. Ms. Harvey's Ambetter

12  policy, for which she paid and continues to pay premiums, went into effect on

13  January 1, 2017.

14      2.      Plaintiff Steven Milman is a dentist with a specialty in periodontics

15  who resides in Travis County, Texas. Dr. Milman contracted with Centene's Texas

16  subsidiary Superior Health to provide health insurance for him and his wife

17  through Defendants' Ambetter policy, effective January 1, 2017. Dr. Milman paid

18  $1,200 per month for his Ambetter policy.

19      3.      Defendant Centene Corporation is a Delaware corporation with its

20  principal place of business at 7700 Forsyth Boulevard, St. Louis, Missouri 63105.

1    Centene separately incorporates subsidiaries in each state in which it offers

2    insurance. Those subsidiaries are controlled and managed by Centene, which sets

3    the policies, practices, and conduct of the subsidiaries. Centene incorporates the

4    financial information of its subsidiaries into its consolidated financial statements

5    and federal tax returns. The subsidiaries, including Coordinated Care and Superior

6    Health, are shells and alter egos of their parent Centene, intended by Centene to

7    shield itself from liability, and also operate in concert and together in a common

8    enterprise and through related activities, as here relevant, so that the actions of one

9    may be imputed to the other and/or so that their corporate formality should be

10    disregarded for purposes of attributing their unlawful conduct to Centene.

11        4.    Defendant Coordinated Care is an Indiana corporation with its

12    principal place of business at 1145 Broadway, Suite 300, Tacoma, Washington

13    98402. Coordinated Care is licensed to sell health insurance in the State of

14    Washington. Coordinated Care is a wholly-owned subsidiary of Centene and

15    operates as Centene's presence in the State of Washington, including offering

16    Centene's Ambetter insurance product. According to Centene, Coordinated Care

17    manages "our Health Benefit Exchange insurance plan: Ambetter" in the State of

18    Washington. https://www.centene.com/states/washington.html (last accessed

19    1/8/18).

20

1    5.    Defendant Superior Health is a Texas corporation with its principal

2    place of business at 2100 South IH-35, Suite 202, Austin, Texas 78704. Superior

3    Health is licensed by the Texas Department of Insurance and is a Qualified Health

4    Plan issuer in the Texas Health Insurance Marketplace. Superior Health is a

5    wholly-owned subsidiary of Centene and operates as Centene's presence in the

6    State of Texas, including offering Centene's Ambetter insurance product.

7    According to Centene, "now, it's easier to stay covered with our Health Insurance

8    Marketplace insurance plan: Ambetter."

9    https://www.centene.com/states/texas.html (last accessed 1/8/2018).

## II. JURISDICTION AND VENUE

11    6.    This Court has subject matter jurisdiction over this proposed class

12    action pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy, exclusive of

13    interest and costs, exceeds the sum or value of $5,000,000 and at least one member

14    of the proposed class is a citizen of a state other than Washington, Missouri,

15    Indiana, Delaware, and Texas, which are Defendants' states of citizenship.

16    7.    Jurisdiction also lies with this Court pursuant to 28 U.S.C. § 1331

17    based on the federal Affordable Care Act, 42 U.S.C. §18001, *et seq.* ("ACA")

18    claims asserted by Plaintiffs.

19    8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b)

20    because a substantial part of the events or omissions giving rise to the Plaintiffs'

claims occurred in this judicial district. Venue is also proper under 18 U.S.C. § 1965(a) because the Defendants transact substantial business in this district.

9.    This Court has authority to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

### III. FACTUAL ALLEGATIONS

**A.    Centene's Business Model**

10.    Centene is one of the nation's largest insurers providing coverage through the ACA and is steadily expanding its operations around the country. Centene earned over $40 billion in 2016, and its revenues continue to increase, jumping 69% in the first quarter of 2017.

11.    Centene targets low-income customers who qualify for substantial government subsidies while simultaneously providing coverage well below what is required by law and by its policies.

12.    Ambetter policyholders around the nation report strikingly similar experiences: After purchasing an Ambetter insurance plan, they learn that the provider network Centene represented was available to Ambetter policyholders was in material measure, if not largely, fictitious. Members have difficulty finding – and in many cases cannot find – medical providers who will accept Ambetter insurance.

13.     Centene misrepresents the number, location, and existence of purported providers by listing physicians, medical groups, and other providers – some of whom have specifically asked to be removed – as participants in their network and by listing nurses and other non-physicians as primary care providers. Defendants have even copied entire physician directories into their purported network lists for some areas, and have, in fact, listed medical students as part of their primary care provider network.

14.     Ambetter policyholders learn of the limitations on available providers only after they commit to the insurance and are locked into the Ambetter policy. Defendants' sales materials omit to state that Centene and its subsidiaries do not adequately monitor their network of providers nor do they provide required reports of their inadequate network to the Insurance Commissioners in their respective states. The Ambetter documentation also fails to disclose that Centene does not consistently provide access to "medically necessary care on a reasonable basis" without charging for out-of-network services.

15.     Defendants also fail to reimburse medical providers' legitimate claims, routinely citing "insufficient diagnostic" evidence as the reason. As a result of Centene failing to pay providers for legitimate claims, a large number of medical providers reject Ambetter insurance, further reducing the provider network available to Ambetter's members.

16.    Centene and its subsidiaries have been sued by medical providers (as well as shareholders) for failing to fulfill their legal responsibilities, and this lawsuit seeks to compel redress from Centene for its failure to comply with the law and the terms of its contracts on behalf of Ambetter policyholders.

**B.    The December 2017 Washington State Consent Order**

17.    Further evidence of Ambetter's wrongful and illegal actions is captured by the Washington State Office of the Insurance Commissioner's order of December 12, 2017 requiring Centene and Coordinated Care to stop selling 2018 Ambetter plans. The Insurance Commissioner intervened after receiving over 100 consumer complaints regarding a lack of doctors in the Ambetter policy network and other deficiencies and after doing its own investigation.

18.    On December 15, 2017, Coordinated Care entered into a consent order with the Insurance Commissioner. The order states that "[b]ased upon the number of consumer complaints and information gathered by the Insurance Commissioner's staff in investigating the consumer complaints, there was sufficient evidence to indicate that the Company failed to monitor its network of providers, failed to report its inadequate network to the Insurance Commissioner, and failed to file a timely alternative access delivery request to ensure that consumers receive access to healthcare providers."

19.    The order also states that Coordinated Care is legally required to provide access to "medically necessary care on a reasonable basis" without charging for out-of-network services. The Insurance Commissioner stated that the order required that Defendants no longer send customers "surprise" bills, including charges for out-of-network care. The consent order requires Defendants to confirm that erroneous billing of customers is corrected and provides for ongoing monitoring.

20.    The Insurance Commissioner levied a $1.5 million fine with $1 million suspended pending no further violations over the next two years.

21.    Following the order, Centene issued a press release stating that it was in the process of addressing "known issues in [its] network."

**C.    Centene Conducts its ACA Operations Through Subsidiaries, Which Act as Extensions of Centene**

22.    Centene is or has been the largest Medicaid Managed Care Organization in the country. It describes itself as a "platform for government-sponsored programs" serving low-income populations, including some of the nation's most vulnerable people. When the ACA Exchanges became operational in 2014, Centene expanded its operations by introducing the Ambetter insurance product, developed specifically for the ACA.

23.    Centene insures more than 1 million people through the ACA's state-based health insurance exchanges. About 90% of Centene's marketplace enrollees

1  are eligible for subsidies. The federal government pays cost-sharing subsidies

2  directly to the insurer.

3      24.    Centene's profitability in the ACA marketplace is due in large part to

4  its exploitation of the ACA subsidy program and other government support, while

5  failing to provide the minimal coverage required.

6      25.    On the ACA exchanges, it is expected that a number of customers will

7  switch in and out of eligibility or will change insurance providers yearly while

8  shopping for policies. This phenomenon is known as "churn." Consequently, every

9  year will bring Defendants new patients unfamiliar with the shoddy nature of

10  Ambetter coverage. "Our game plan was churn. That's it," according to Centene's

11  CEO. In addition, some customers will not need to utilize medical practitioners in

12  any given year. These customers may unwittingly continue to purchase Ambetter,

13  discovering its inferior coverage only when they have a need to obtain medical

14  care.

15      26.    Centene – directly and through its wholly-owned and controlled

16  subsidiaries – offers Ambetter in 15 states. Those states include: Arkansas,

17  Arizona, Florida, Georgia, Illinois, Indiana, Kansas, Massachusetts, Mississippi,

18  Missouri, New Hampshire, Nevada, Ohio, Texas, and Washington.

19  https://www.ambetterhealth.com/health-plans/select-your-state.html (last accessed

20  1/8/2018).

27.     Ambetter "is [Centene's] suite of health insurance product offerings for the Health Insurance Marketplace." The "family" of "Ambetter Health Plans" are certified as Qualified Health Plan issuers in the Health Insurance Marketplace." https://www.ambetterhealth.com/about-us.html (last accessed 1/8/2018).

28.     According to Centene, it "sells health plan options through the [Health Insurance Marketplace] under the product, Ambetter." https://www.centene.com/who-we-help/health-insurance-marketplace.html (last accessed 1/8/18).

29.     Centene controls the day-to-day operations of its subsidiaries – down to the details. For example, the subsidiaries' web sites each contain language describing Ambetter and the involvement of Centene in substantially the same language, and often verbatim.

30.     On the universal Ambetter web site (as opposed to the state-specific sites that each subsidiary posts), Centene represents that "Our Ambetter products are offered by Centene Corporation … on a local level." https://www.ambetterhealth.com/about-us.html (last accessed 1/8/2018).

**D.     The ACA's Statutory Scheme Governing Health Insurance**

31.     The ACA was enacted by the United States Congress in March 2010 for the express purpose of providing affordable health care coverage to all citizens, regardless of their pre-existing health conditions or other barriers to coverage. 42

U.S.C. §18001, *et seq*. As part of its overhaul of health insurance, the ACA enacted a series of provisions aimed at ensuring minimum levels of health care coverage, termed the "Patient's Bill of Rights." The requirements include, among other things, giving patients the right to choose a doctor, the provision of no-cost preventive care, and the ending of pre-existing condition exclusions. 42 U.S.C. §§ 300gg-1 - 300gg-19a, https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Market-Reforms/Patients-Bill-of-Rights.html (last accessed 1/8/2018); *see also* 45 C.F.R. Part 147 (Department of Health and Human Services implementing regulations for these rights).

32.     Under the ACA, a Health Insurance Exchange ("HIE"), also known as the Health Insurance Marketplace ("HIM"), is a platform through which plans that meet ACA requirements are sold to consumers. 42 U.S.C. § 18031(b). A Qualified Health Plan ("QHP"), as defined in the ACA, is a major medical health insurance plan that covers all the mandatory benefits of the ACA and may be sold through a state HIM. A QHP is also eligible to be purchased with cost-sharing and premium tax credit subsidies.

33.     All QHPs offered in the Marketplace must cover 10 categories of "essential health benefits" with limited cost-sharing, including:

        a.     Ambulatory patient services (outpatient care one can get without being admitted to a hospital);

b.    Emergency services;

c.    Hospitalization (surgery, overnight stays, etc.);

d.    Pregnancy, maternity, and newborn care;

e.    Mental health and substance use disorder services, including behavioral health treatment;

f.    Prescription drugs;

g.    Rehabilitative and habilitative services and devices (services and devices for people with injuries, disabilities, or chronic conditions);

h.    Laboratory services;

i.    Preventive and wellness services and chronic disease management; and

j.    Pediatric services, including oral and vision care (excluding adult dental and vision).

42 U.S.C. § 18022; 42 U.S.C. § 300gg-13.

34.    These "essential health benefits" – including their limitations on "cost sharing" (deductibles, coinsurance, copayments, and similar charges) – are minimum requirements for all Marketplace plans.  42 U.S.C. § 18022.

1

**E.    Other ACA Requirements and Prohibitions**

2      35.    To help ensure that plans offered on the ACA marketplaces serve the

3    needs of enrollees, the ACA established a national standard for network adequacy.

4    42 U.S.C. § 18031(c)(1)(B); 45 C.F.R. § 147.200(a)(2)(i)(K). Marketplace plans

5    must maintain "a network that is sufficient in number and types of providers" so

6    that "all services will be accessible without unreasonable delay," and insurers are

7    required to disclose their provider directories to the marketplace for online

8    publication. 45 C.F.R. § 156.230(b)(2). In addition, the health law requires

9    marketplace plans to include within their networks a sufficient number and

10   geographic distribution of "essential community providers" that serve

11   predominantly low-income, medically-underserved individuals. 42 U.S.C. §

12   18031(c)(1)(C); 45 C.F.R. § 156.235.

13     36.    A health insurance issuer offering individual health insurance

14   coverage must also provide a current and accurate summary of benefits and

15   coverage to individuals covered under the policy upon receiving an application for

16   any health insurance policy. The required summary must provide, among other

17   things:

18        a.    A description of the coverage, including cost sharing, for each

19             category of benefits identified by the Secretary in guidance;

20        b.    The exceptions, reductions, and limitations of the coverage;

c.    Coverage examples, in accordance with the rules of this section;

d.    An internet address with a list of providers; and

e.    An internet address providing information about prescription drug coverage.

45 C.F.R. § 147.200(a)(2).

37.    The ACA does not displace state laws that impose stricter requirements on health care service plans than those imposed by the ACA, and it expressly preserves state laws that offer additional consumer protections that do not "prevent the application" of any ACA requirement.

**F.    State Law Applicable to ACA Insurance Plans**

38.    Most states – including the states of the prospective class members – have laws prohibiting deceptive marketing of insurance plans and failing to provide adequate insurance benefits which are substantially similar to the laws of Washington and Texas, the states in which the two named Plaintiffs reside.

Washington ACA Health Plan Requirements and Prohibitions

39.    Washington State law requires that insurers' health plan networks meet additional state requirements, including providing "a comprehensive range of primary, specialty, institutional, and ancillary services" that "are readily available" to health plan enrollees. WAC 284-170-200(1); *see also* WAC 284-170-270. This includes ensuring that each provider network includes a sufficient number of

certain types of medical professionals, such as women's health care practitioners (RCW 48.42.100), tribal health care providers (WAC 284-170-200(9)), primary care doctors (WAC 284-170-200(1), and mental health providers (WAC 284-170-200(11)). Washington law also requires that insurers' plan networks maintain sufficient numbers of each type of provider to meet anticipated consumer needs. WAC 284-170-200(4).

40.    In addition, members must have adequate choice among health care providers, including those providers which must be included in the network by law. WAC 284-170-200(2).

41.    Washington law requires disclosure of any restrictions or limitations on access to network providers and requires that the provider directory must be updated at least monthly. WAC 284-170-200(8); WAC 284-170-260.

42.    Washington law prohibits any false or deceptive advertising of health insurance plans, as well as the misrepresentation of insurance policy provisions. RCW 48.44.110, RCW 48.44.120, WAC 284-30-350.

43.    The Washington Consumer Protection Act ("CPA") also generally prohibits unfair or deceptive conduct in trade or commerce. RCW 19.86.010. Persons injured in their business or property have a private right of action under the CPA. RCW 19.86.090.

Texas Health Plan Requirements and Prohibitions

44.     Like Washington, Texas has specific laws governing the operations of health care insurers. Texas Insurance Code Chapter 541 prohibits "unfair method[s] of competition or [] unfair or deceptive act[s] or practice[s] in the business of insurance." Tex. Ins. Code § 541.003.

45.     The statute specifically prohibits misrepresenting the terms or benefits of an insurance policy, among other things. Tex. Ins. Code § 541.051.

46.     Chapter 541 of the Texas Insurance Code also authorizes private causes of action, as well as private class actions, incorporating any conduct enumerated in section 17.46(b) of the Texas Business & Commerce Code – part of the Texas Deceptive Trade Practices - Consumer Protection Act.  Tex. Ins. Code § 541.151. The statute authorizes injunctive relief as well as damages. *Id*.

47.     The Texas Deceptive Trade Practices - Consumer Protection Act (Texas Business and Commerce Code Chapter 17.41) ("TDTPA") is specifically incorporated into the Insurance Code deceptive practices act. A violation of any prohibition enumerated in the TDTPA constitutes a violation of the Insurance Code, and a private cause of action – including a class action – is specifically authorized.

48.     The TDTPA lists acts or practices that are false, misleading or deceptive, including: causing confusion about goods or services, representing that

goods or services have characteristics which they do not have, representing that

goods or services are of a particular standard or quality if they are not,

misrepresenting the nature of an agreement or guarantees or warranties. Tex. Bus.

& Comm. Code § 17.46(b).

**G.    Defendants' Coverage is Less than What is Marketed in its Plans**

49.    Defendants describe Ambetter as a Qualified Health Plan as defined in

the ACA, which requires that the plan cover all of the ACA's mandatory benefits.

Defendants specifically represent to prospective and existing customers that

"Ambetter Health Plans are certified as Qualified Health Plan issuers in the Health

Insurance Marketplace" and represent that the plan complies with the requirements

of the ACA. https://www.ambetterhealth.com/about-us.html (last accessed

1/8/2018).

50.    Defendants market to prospective customers that "no matter which

Ambetter plan you choose, you can always count on access to high quality,

comprehensive care that delivers services, support and all of your Essential Health

Benefits." Of the three Ambetter plans that are offered – Bronze, Silver and Gold –

Defendants assure potential customers that "the only difference between these

plans is how much premium you'll pay each month and how much you'll pay for

certain medical services."

51.    Defendants state that Ambetter provides "Complete medical coverage that meets your medical needs and contains all of the Essential Health Benefits." Defendants provided details of these purported benefits and coverage in brochures made available to the public on their websites. Defendants assure the public in those materials that the promised coverage will be provided to customers.

52.    Defendants also describe their "Provider Network Design" in advertising Ambetter on the website they dedicate to the plan. Specifically, Defendants state in their marketing material:

> The Ambetter network includes healthcare providers to deliver all of the services that the Affordable Care Act describes as Essential Health Benefits. These include:
>
> Preventive care
>
> Hospitalization coverage
>
> Emergency services
>
> And more (refer to your Evidence of Coverage (EOC) for the full list of benefits)
>
> To accomplish these goals, Ambetter contracts with a full range of practitioners and providers such as:
>
> Primary care doctors
>
> Behavioral health practitioners
> Specialty physicians, such as cardiologists, neurologists, etc.

Providers, including hospitals, pharmacies, medical equipment companies, etc.

Ambetter makes sure practitioners and providers of all types are available within a certain geographic mileage or driving time from each of our members' homes to ensure you receive quality care in a timely manner.

Ambetter contracts with providers who accept our contract terms, meet our credentialing criteria, and agree to our reimbursement terms. We regularly review the provider network and make decisions about which providers remain in the network and if additional providers are needed, based on relevant factors that could include:

The availability of certain types of practitioners or hospitals in your area.

The ability of practitioners to meet our credentialing criteria, including a valid license to practice, applicable education and training, appropriate work history, etc.

Assessment of facilities such as hospitals, to ensure they are appropriately licensed and accredited.

Monitoring of the quality of care and service provided by individual practitioners and providers, which includes complaints from members and patient safety concerns.

https://www.ambetterhealth.com/find-a-provider/provider-network-design.html (last accessed 1/8/2018).

    53.    Defendants advertise that potential customers are able to use Defendants' websites to see the providers they represent as being in their provider

network. Specifically, Defendants' websites offered, and continue to offer, a feature allowing potential enrollees to search Defendants' networks of providers. This feature is available to all potential Ambetter customers in each state in which Centene operates. *See* https://providersearch.ambetterhealth.com/) (last accessed 1/8/2018). Defendants appear to have copied contact information as to various physicians from lists or medical directories and listed those providers as being part of their network even though those providers were not actually part of the provider network for Ambetter. In some areas, Defendants have simply copied into their purported network an entire physician directory. In some cases, Defendants have even listed the cellular telephone number of physicians who were not in the Ambetter network. In fact, Defendants have listed medical students, nurses, and other non-physicians in their list of in-network primary care providers.

54.    Defendants' provider network was and is so limited that holders of Ambetter policies would have to travel long distances to see a medical provider, if one legitimately within Defendants' network could be found at all.

55.    Defendants' online brochures and other materials available to prospective members further represent that members' grievances will be diligently documented by Defendants and promptly addressed.

56.    The Centers for Medicare and Medicaid Services ("CMS") conducted an audit of Centene's Medicare operations from May 16, 2016 through May 27,

2016. CMS auditors reported that (1) Centene failed to comply with Medicare requirements related to Part D formulary and benefit administration and coverage determinations, appeals, and grievances, and that (2) Centene's failures were systemic and adversely affected enrollees. According to CMS, the enrollees experienced delayed or denied access to covered benefits, increased out-of-pocket costs, and/or inadequate grievance or appeal rights.  CMS Report, January 12, 2017. https://www.cms.gov/Medicare/Compliance-and-Audits/Part-C-and-Part-D-Compliance-and-Audits/Downloads/Centene_Corporation_CMP_1-12-17.pdf  (last accessed 1/8/2018).

**H.**    **Defendants' Failure to Pay Claims, Resulting in Even Smaller Networks and Lack of Benefits and Coverage**

57.    Defendants routinely deny coverage for medical services, claiming that the provider did not show sufficient diagnostic evidence that the care was necessary. Centene and a subsidiary were sued in 2016 by a group of providers who alleged that Defendants wrongfully denied claims of their members that were within the scope of the members' Ambetter policies.

58.    As a result of this practice of denying legitimate claims, many providers will not accept patients insured by Ambetter, making it even more difficult for Ambetter members to find in-network providers.

1

**I.    Plaintiffs' and Class Members' Experiences with Ambetter**

2    59.    Plaintiff Harvey viewed the information supplied by Centene and

3    Coordinated Care through www.wahealthfinder.org in the last two months of 2016.

4    Among the information she reviewed were (1) the Summary of Benefits and

5    Coverage under the heading Ambetter from Coordinated Care Corporation:

6    Ambetter Balanced Care 10 (2017) + Vision ("Plan Summary"), (2) the

7    "Ambetter" Balanced Care 10 (2017) Plan Brochure ("Plan Brochure"); and (3) the

8    "Ambetter" Preventive Services Guide, effective January 1, 2017, which identifies

9    Centene Corporation on the cover as the copyright holder. After reviewing this

10    information, Ms. Harvey bought Centene's Ambetter Health Insurance Policy,

11    Silver Metal type, from its Washington subsidiary Coordinated Care on the

12    Washington Benefit Health Exchange in December 2016.

13    60.    The Plan Brochure represents that Ambetter "provides quality

14    healthcare solutions" with coverage options that make it "easier to take charge of

15    your health." It further states that, "By choosing Ambetter from Coordinated Care,

16    you'll receive affordable, quality healthcare coverage. . . ."  The Plan Brochure

17    also represents that the "Providers listed in the Ambetter from Coordinated Care

18    online directory are in-network." The Plan Brochure and Plan Summary also

19    purport to describe generally what services are covered and what are not, but are

20    misleading by failing to indicate how few in-network providers would be available.

1   For example, they indicate that emergency room services would be covered,

2   although out-of-network charges might be incurred for out-of-network providers

3   working in an otherwise covered emergency room. They fail to disclose, however,

4   that in the Spokane area, during 2017, they had zero emergency room physicians

5   who were in-network, causing Plaintiff Harvey to incur a charge of $1,544 for

6   treatment received from an emergency room doctor.

7       61.    Centene and Coordinated Care also failed to cover individual

8   elements of Ms. Harvey's medical visits because they were not in-network. For

9   example, Plaintiff Harvey received services from a covered doctor on March 17,

10  2017, but then received a bill from the lab used by that doctor. Similarly, Plaintiff

11  Harvey, who has been identified as high risk for colorectal cancer, was advised by

12  Coordinated Care to get a colonoscopy. Colonoscopies are within the preventive

13  services required by the ACA to be included in coverage and are identified as

14  covered in Centene's Preventive Care brochure. When she got the colonoscopy

15  from a covered doctor, however, her claims for two of the technicians involved in

16  the procedure were denied.

17      62.    Plaintiff Harvey appealed each of the many denials of her claims, and

18  included the Washington State Office of Insurance Commissioner, Consumer

19  Advocacy, in her submissions. In many cases, her appeal was ultimately

20  successful, indicating that the initial denial of her claims was invalid. However, she

1  was forced to complete the process of appeal, while providers were sending her

2  bills and deeming her a credit risk. Coordinated Care also made it difficult to

3  contact the company or obtain information, such as the status of appeals regarding

4  invalid denials. Typically, Coordinated Care would respond to her messages by

5  asking her to call, which she did, only to find it would take hours to get through the

6  phone system to find someone who could help her try to find providers (which

7  were generally not available) or to accept an appeal of a wrongly denied claim. At

8  the end of 2017, Plaintiff Harvey's policy automatically renewed for 2018 without

9  any action on her part, and she had paid and continues to pay monthly premiums

10  on this policy.

11       63.     Dr. Milman researched Superior Health's Ambetter provider network

12  before enrolling in January 2017. Superior Health represented on its website that

13  Austin Diagnostic Clinic in Austin, Texas, a facility with approximately 140

14  physicians, was in the Ambetter provider network. As a result of this

15  representation, Dr. Milman purchased an Ambetter policy covering himself and his

16  wife, paying a monthly premium of over $1,200.

17       64.     Austin Diagnostic Clinic, however, was not a provider in the

18  Ambetter policy network. The medical group had specifically informed Superior

19  Health in writing months earlier that the group no longer accepted Ambetter

20

COMPLAINT – CLASS ACTION - 24

1  policies as insurance. This medical group continued to be listed as part of the

2  Ambetter network nonetheless.

3      65.    When Superior Health finally assigned Dr. Milman a primary care

4  provider – after a lengthy delay and repeated efforts on his part– he was assigned

5  to an ob/gyn, who understandably does not treat men.

6      66.    After spending thousands of dollars on insurance premiums and not

7  being able to get basic medical care, Dr. Milman terminated his contract with

8  Superior Health on August 1, 2017.

9      67.    Other members of the Classes have had similar experiences.  One

10  Superior Health/Ambetter member attempted to schedule an appointment with

11  someone listed as a primary care physician on the provider network, only to find

12  out that the person was a nurse practitioner. Another person listed as a physician

13  provider was a medical student at University of North Texas Medical School.

14  Defendants may have copied a roster of medical students and posted it on their

15  website on their provider network page. According to a number of physicians the

16  member spoke to, providers refuse to accept Ambetter because Superior Health

17  routinely refuses to pay legitimate claims, often citing insufficient diagnostics as

18  the reason for the refusal even when all relevant diagnostic information had been

19  obtained and indicated the reasonableness of the treatment provided.

20

68.     Another Ambetter enrollee is a 60-year-old widow with medical issues. The federal government pays a monthly subsidy of $662 for her Ambetter insurance. Despite this substantial government subsidy, she has consistently encountered difficulties with finding a medical provider willing to accept the Ambetter plan. She has to drive extraordinary distances to find a provider within Ambetter's network, an ordeal which can be insurmountable given her medical condition.

**J.     CLASS ACTION ALLEGATIONS**

69.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) and LR 23(i) on behalf of the following classes:

       a.     **Nationwide Class:** All persons in the United States who were insured by Defendants' Ambetter insurance product which was purchased through an ACA HIE from January 11, 2012 to the present (the "Nationwide Class"). Excluded from the Nationwide Class are Defendants, Defendants' employees, Defendants' subsidiaries, the Judge(s) to which this case is assigned and the immediate family of the Judge(s) to which this case is assigned.

b.   **State Classes -- Washington:** All persons in the state of Washington who were insured by Defendants' Ambetter insurance product which was purchased through an ACA HIE from January 11, 2012 to the present (the "Washington State Class"). Excluded from the Washington State Class are Defendants, Defendants' employees, Defendants' subsidiaries, the Judge(s) to which this case is assigned and the immediate family of the Judge(s) to which this case is assigned.

c.   **State Classes -- Texas:** All persons in the state of Texas who were insured by Defendants' Ambetter insurance product which was purchased through an ACA HIE from January 11, 2012 to the present (the "Texas State Class"). Excluded from the Texas State Class are Defendants, Defendants' employees, Defendants' subsidiaries, the Judge(s) to which this case is assigned and the immediate family of the Judge(s) to which this case is assigned.

70.   These Class Definitions may be amended or modified as warranted by discovery or other activities in the case hereafter. Collectively, the Nationwide, Washington State, and Texas State Classes are referred to the "Classes."

71.    Numerosity: The Classes encompass thousands of individuals dispersed geographically throughout the 15 states in which Ambetter policies are and have been offered. Therefore, the proposed Classes are so numerous that joinder of all members is impracticable. The Classes are ascertainable from Defendants' records.

72.    Typicality: Plaintiffs' claims are typical of the claims of the Classes, because Plaintiffs and the members of the Classes each purchased an Ambetter policy and were similarly damaged thereby. The members of the Classes have also been damaged as a result of Defendants' erroneous billing practices.  Plaintiffs and the other members of the Classes also share the same interest in preventing Defendants from engaging in such activity in the future.

73.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs have retained counsel competent and experienced in class and consumer litigation and have no conflict of interest with other members of the Classes in the maintenance of this class action. Plaintiffs have no relationship with Defendants except as policyholders who entered into contracts with Defendants.  Plaintiffs will vigorously pursue the claims of the Classes.

74.     Existence and Predominance of Common Questions of Fact and Law: This case presents many common questions of law and fact that will predominate over any questions affecting members of the Classes only as individuals. The damages sustained by Plaintiffs and the Classes' members flow from the common nucleus of operative facts surrounding Defendants' misconduct. The common questions include, but are not limited to, the following:

     a.    Whether Defendants' conduct violated the ACA and Washington, Texas, and other states' laws through the conduct alleged herein;

     b.    Whether Defendants breached their contracts by violating the ACA, Washington, Texas, and other states' laws or the terms of the contracts themselves through the conduct alleged herein;

     c.    Whether Defendants or their agents pursued uniform policies and procedures in their Ambetter policy sales, customer service, and/or claims processing;

     d.    Whether Defendants failed to comply with the terms of the Ambetter health insurance policies;

     e.    Whether Defendant Centene operated its state subsidiaries as shells or alter egos such that the law should disregard their separate corporate identities; and

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

   f. Whether Plaintiffs and the Classes' members are entitled to monetary damages or injunctive relief and/or other remedies and, if so, the nature of any such relief.

  75. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the members of the Classes to individually seek redress for the wrongs done to them. Plaintiffs believe that members of the Classes, to the extent they are aware of their rights against Defendants, would be unable to secure counsel to litigate their claims on an individual basis because of the relatively limited nature of the individual damages, and that a class action is the only feasible means of recovery for these individuals. Even if members of the Classes could afford such individual litigation, the court system could not. Individual litigation would pose a high likelihood of inconsistent and contradictory judgments. Further, individualized litigation would increase the delay and expense to all parties and to the court system, due to the complex legal and factual issues presented by this dispute. By contrast, the class action procedure presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

This action presents no difficulties in management that would preclude its maintenance as a class action.

76. In the alternative, the Classes may be certified because:

    a.    the prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants;

    b.    the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of the other members of the Classes not parties to the adjudications, or substantially impair or impede the ability to protect their interests; and

    c.    Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the Classes. In addition, Plaintiffs have alleged, and intend to show, that any corporate formalities between the Defendants should be disregarded.

# IV. CLAIMS FOR RELIEF

## COUNT I
### Breach of the Affordable Care Act, 42 U.S.C. §§ 18001, et seq.
### (Brought on Behalf of All Classes)

77.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs above, as if fully set forth here verbatim.

78.     Plaintiffs' and the Classes' members' health plans are subject to the statutory and regulatory requirements of the ACA, including enforcement rights.

79.     It is part of Defendants' responsibilities and duties to provide and administer health insurance coverage that satisfies the ACA-mandated care requirements, including providing an adequate and accurate provider network and accurately representing the providers in that network. Defendants also had a duty pursuant to the ACA to describe accurately and then provide the benefits and coverage in the Ambetter plan, as well as pay legitimate claims made by providers.

80.     Defendants failed to fulfill those responsibilities.

81.     As plan participants, Plaintiffs and the members of the Classes have the right to enforce the provisions of the requirements of the ACA and the federal regulations promulgated thereunder, and in particular, the provisions requiring that an accurate and current list of medical providers within an insurer's network be provided, and that an insurer accurately describe the benefits and coverage provided by its plan.

82.    Defendants violated and continue to violate the ACA by failing to provide an accurate and current listing of in-network providers; denying coverage and/or refusing to pay for covered benefits; failing to ensure that their network includes providers within a reasonable distance from plan members; and failing to address Plaintiffs' and other Class members' complaints and grievances adequately.

83.    By violating their duties under the ACA, Defendants have denied and continue to deny mandated access to coverage to Plaintiffs and the members of the Classes.

84.    Defendant Centene recently announced its intention to expand its HIE coverage into new states, as well as expand the geographic scope of its coverage in the states in which it already operates. If Defendants' unlawful conduct is not enjoined, many more people insured through Ambetter will be wrongfully foreclosed from receiving the benefits to which they are entitled under the ACA.

85.    Plaintiffs and members of the Classes have been aggrieved and have suffered monetary damage by Defendants' violations of the ACA in the form of all or part of the premiums they have paid to Defendants.  If Defendants' unlawful conduct is not stopped, Plaintiffs and members of the Classes will continue to be harmed by Defendants' misconduct.

**COUNT II**
**Breach of Contract**
**(Brought on Behalf of All Classes)**

86.     Plaintiffs repeat and reallege the allegations contained in the paragraphs 1-76, as if fully set forth here verbatim.

87.     Plaintiffs and the members of the Classes entered into valid and binding written contracts with Defendants for the purchase of Ambetter insurance policies.

88.     Defendants' policies state that, under the policy, Plaintiffs and members of the Classes have the "right to:" (a) "A current list of Network Providers," (b) "Adequate access to qualified Physicians and Medical Practitioners and treatment or services regardless of . . . geographic location, health condition, national origin or religion," and (c) "Access Medically Necessary urgent and Emergency Services 24 hours a day and seven days a week."

89.     Defendants' policies further state that, "We and the Member shall comply with all applicable state and federal laws and regulations in performance of this Contract."

90.     For the reasons alleged above, Defendants breached each of these provisions of the policies issued to Plaintiffs and the members of the Classes.

91.     Plaintiffs and the members of the Classes have performed all conditions precedent to the application of the policies.

92.     Plaintiffs and members of the Classes suffered damages as a direct and proximate result of Defendants' breach of contract, consisting of all or part of the amount of the premiums they paid as well as the amounts they paid pursuant to improper billings by Defendants and expenses incurred in seeking or obtaining medical services.

93.     Every contract contains an implied covenant of good faith and fair dealing.

94.     Defendants' conduct, including failing to provide accurate information regarding their provider networks, denying valid claims, failing to pay providers for valid claims, and collecting premiums while failing to provide an adequate network of providers that included emergency room physicians, labs used by in network providers and the like, destroyed the rights of Plaintiffs and members of the Classes to receive the benefits of their contracts.

95.     As a result of the foregoing, Plaintiffs and the members of the Classes are entitled to compensatory damages in an amount to be proven at trial and to an order requiring Defendants to perform their contracts as they agreed to do.

**COUNT III**
**Unfair Business Practices under RCW §§ 19.86.010,** *et seq.*
**(Brought on Behalf of the Washington State Class)**

96.     Plaintiffs incorporate the allegations of paragraphs 1-76, as if fully set forth here verbatim.

97.    Plaintiff Harvey and the Washington State Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW § 19.86.010(1).

98.    Defendants are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1), and conduct "trade" and "commerce" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(2).

99.    Defendants engaged in unfair acts or practices in the conduct of their business by failing to have sufficient providers within the Ambetter network as represented, by failing to pay legitimate medical claims on behalf of their insured, by failing to provide the benefits and coverage represented by Defendants to be within the plan, by failing to address Plaintiff Harvey's and other Washington State Class members' complaints, by violating Washington state laws and regulations governing the conduct and operations of health insurers, by violating the ACA, and by omitting material facts regarding the benefits and coverage of Ambetter policies.

100.    Defendants further engaged in unfair acts or practices in the conduct of their business when they continued to engage in unfair practices, despite numerous complaints from Washington State Class members and at least findings by both the Washington State and the federal government that their systematic

practices failed to meet acceptable standards and harmed enrollees.

101.   The acts and practices described above are unfair because these acts or practices (1) have caused substantial financial injury to Plaintiff Harvey and Washington State Class members; (2) are not outweighed by any countervailing benefits to consumers or competitors; and (3) are not reasonably avoidable by consumers. The acts and practices are further unfair because they offend public policy as it has been established by the ACA and by Washington statutes and regulations, including RCW 48.44.110 and 48.44.120 and WAC 284-170-200 and 284-170-260.

102.   Defendants' unfair practices have occurred in their trade or business and were and are capable of injuring a substantial portion of the public. As such, Defendants' general course of conduct as alleged herein is injurious to the public interest, and the acts complained of herein are ongoing and/or have a substantial likelihood of being repeated.

103.   As a direct and proximate result of Defendants' unfair acts or practices, Plaintiff Harvey and Washington State Class members suffered injury in fact by paying insurance premiums but failing to receive benefits, paying out-of-pocket costs for services covered but not provided by the Ambetter plan, and spending time and money locating and traveling to providers willing to accept the Ambetter plan.

104.   Plaintiff Harvey and Washington State Class members are therefore entitled to an order enjoining the conduct complained herein; actual damages to Plaintiff Harvey and the members of the Washington State Class equal to: (a) a refund of the entire premium for the purchase of virtually worthless insurance, or (b) in the alternative, the difference in value between the value of the policy as represented (the full premium prices paid) and the value of the policy as actually accepted and delivered; damages incurred as a result of having to pay for services that should have been covered by the insurance if the Defendants provided the services that were represented and required; treble damages pursuant to RCW § 19.86.090; costs of suit, including reasonable attorney's fees; and such other further damages and relief as the Court may deem proper.

105.   Plaintiff Harvey and the Washington State Class members are also entitled to additional equitable relief as the Court deems appropriate, including, but not limited to, disgorgement, for the benefit of the Washington State Class members, of all or part of the ill-gotten profits Defendants received in connection with the policies.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

**COUNT IV**
**Unfair Business Practices and Consumer Fraud under**
**Texas Bus. & Prof. Code §§ 17.41, *et seq*.**
**(Brought on Behalf of the Texas State Class)**

106.    Plaintiffs incorporate the allegations of paragraphs 1-76, as if fully set forth here verbatim.

107.    The TDTPA declares unlawful (i) an unfair or deceptive act or practice, (ii) occurring in trade or commerce, (iii) with a public interest impact, and (iv) which causes injury to persons.  These statutes apply to deceptive conduct on the part of insurance companies.

108.    Plaintiff Milman and the Texas State Class Members are "persons" within the meaning of the statutes.  Tex. Bus. & Com. Code § 17.45(4). Plaintiff Milman and the Texas State Class Members were at all relevant times consumers and were in privity of contract with Superior Health and Centene with respect to an insurance contract.

109.    Defendants also are "persons" within the meaning of the consumer protection statutes, and they conduct "trade" or "commerce." Tex. Ins. Code Ann. §§ 541.002, 541.151.

110.    At all relevant times, Defendants were engaged in unfair acts or practices in the conduct of its business by intentionally and knowingly misrepresenting or concealing material facts related to the benefits and coverage of the Ambetter plan, including by misrepresenting the providers within the Ambetter

COMPLAINT – CLASS ACTION - 39

network; by failing to pay legitimate medical claims on behalf of their insureds; by failing to provide the benefits and coverage represented by Defendants to be within the plan; by failing to address Plaintiff Milman's and Texas State Class members' complaints; by violating state laws and regulations governing the conduct and operations of health insurers, by violating the ACA; and by omitting material facts regarding the benefits and coverage of Ambetter policies.

111.    Defendants further knowingly engaged in unfair acts or practices in the conduct of their business when they continued to engage in deceptive and unfair practices, despite numerous complaints from Texas State Class members and at least one finding by the federal government that their systematic practices failed to meet acceptable standards and harmed enrollees.

112.    Plaintiff Milman and the Texas State Class Members relied on Defendants' misrepresentations.

113.    Defendants' unfair practices occurred in their trade or business and were and are capable of injuring a substantial portion of the public. As such, Defendants' general course of conduct as alleged herein is injurious to the public interest, and the acts complained of herein are ongoing and/or have a substantial likelihood of being repeated.

114.    As a direct and proximate result of Defendants' unfair acts or practices, Plaintiff Milman and Texas State Class members suffered injury in fact

by paying insurance premiums but failing to receive benefits, paying out-of-pocket costs for services covered but not provided by the Ambetter plan, and spending time and money locating and traveling to providers willing to accept the Ambetter plan.

115.    Plaintiff Milman and Texas State Class members are therefore entitled to an order enjoining the conduct complained herein; actual damages equal to: (a) a refund of the premium entirely for the purchase of virtually worthless insurance, or (b) in the alternative, the difference in value between the value of the policy as represented (the full premium prices paid) and the value of the policy as actually accepted and delivered; "benefit of the bargain" damages, multiple damages, and exemplary damages pursuant to Texas Bus. and Prof. Code § 17.50(b)(1) and Civil Practices and Remedies Code § 41.003(a)(1) based on Defendants' knowing and intentional conduct; costs of suit, including a reasonable attorney's fees; and such other further damages and relief as the Court may deem proper and/or may be obtainable under relevant law.

116.    Plaintiff Milman and the Texas State Class members are also entitled to additional equitable relief as the Court deems appropriate, including, but not limited to, disgorgement, for the benefit of the Texas State Class members, of all or part of the ill-gotten profits Defendants received in connection with the policies.

117.    Plaintiff Milman timely notified Defendants of the bases for his claims and damages pursuant to section 17.505(a) of the Texas Business and Commerce Code and section 541.154 of the Texas Insurance Code, and has complied with all conditions precedent in bringing this action.

## V. PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs, individually and on behalf of the members of the Classes, pray for relief as follows:

A.    An order certifying this action to proceed as a class action, and appointing Plaintiffs and their counsel to represent the Classes;

B.    An order awarding damages to Plaintiffs and the members of the Classes, including, where appropriate, treble damages, exemplary damages, and all other monetary relief to which Plaintiffs and the Classes' members are entitled;

C.    For an order awarding restitutionary disgorgement to Plaintiffs and the Classes;

D.    For an order awarding non-restitutionary disgorgement to Plaintiffs and the Classes;

E.    For a declaration that Defendants have violated applicable state and federal law, including the ACA, and an order requiring Defendants to immediately cease and desist their unlawful, deceptive, and obstructive practices with respect to

1  the marketing, administration, and claims processing in connection with the

2  Ambetter health insurance plan;

3       F.     For an order awarding attorneys' fees and costs;

4       G.     For an order awarding punitive damages where permitted pursuant to

5  governing law; and

6       H.     For such other and further relief as may be just and equitable.

7  **JURY DEMAND**

8       Plaintiffs demand a trial by jury on all issues so triable.

9       RESPECTFULLY SUBMITTED AND DATED this 11th day of January,

10  2018.

11                     TERRELL MARSHALL LAW GROUP PLLC

12                     By:  /s/ Beth E. Terrell, WSBA #26759
                          Beth E. Terrell, WSBA #26759

13                            Jennifer R. Murray, WSBA #36983
                          Elizabeth A. Adams, WSBA #49175

14                            Terrell Marshall Law Group PLLC
                          936 North 34th Street, Suite 300

15                            Seattle, Washington 98103
                          Telephone: (206) 816-6603

16                            Facsimile: (206) 319-5450
                          Email: bterrell@terrellmarshall.com

17                            Email: jmurray@terrellmarshall.com
                          Email: eadams@terrellmarshall.com

18

19

20

Robert S. Green, *Pro Hac Vice Forthcoming*
James Robert Noblin,
*Pro Hac Vice Forthcoming*
Attorneys for Plaintiffs and the Classes
GREEN & NOBLIN, P.C.
2200 Larkspur Landing Circle, Suite 101
Larkspur, California 94939
Telephone: (415) 477-6700
Email: gnecf@classcounsel.com
Email: jrn@classcounsel.com

David Martin, *Pro Hac Vice Forthcoming*
Mark Ravis, *Pro Hac Vice Forthcoming*
Attorneys for Plaintiffs and the Classes
MARK RAVIS & ASSOCIATES
1875 Century Park East, Suite 700
Los Angeles, California 90067
Telephone: (310) 295-4145
Email: dhmartin99@gmail.com
Email: mravis99@gmail.com

Seth Lesser, *Pro Hac Vice Forthcoming*
Alexis Castillo, *Pro Hac Vice Forthcoming*
Attorneys for Plaintiffs and the Classes
KLAFTER OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, New York 10514
Telephone: (914) 934-9200
Email: seth@klaferolsen.com
Email: alexis.castillo@klafterolsen.com

Kurt B. Olsen, *Pro Hac Vice Forthcoming*
Attorneys for Plaintiffs and the Classes
KLAFTER OLSEN & LESSER LLP
1250 Connecticut Avenue, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 261-3553
Email: ko@klafterolsen.com