FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Nov 21, 2018

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CYNTHIA HARVEY, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>CENTENE MANAGEMENT COMPANY LLC and COORDINATED CARE CORPORATION,<br><br>                              Defendants. | No.   2:18-CV-00012-SMJ<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** |

Before the Court is Defendants Centene Management Company LLC and Coordinated Care Corporation's Motion to Dismiss Second Amended Complaint, ECF No. 50. Defendants ask the Court to dismiss Plaintiff Cynthia Harvey's class action complaint alleging breach of contract and violation of the Consumer Protection Act ("CPA"), chapter 19.86 of the Revised Code of Washington ("RCW"). ECF No. 48. Harvey, a purchaser of Defendants' Ambetter health insurance policy, claims Defendants "misrepresented and made material omissions regarding the coverage actually provided by [their] Ambetter policy, which did not deliver the insurance services for which the [Washington State Office of the

Insurance Commissioner] approved [the] filed rates." *Id.* at 7. Defendants argue Harvey fails to state a claim upon which relief can be granted. For the following reasons, the Court grants the motion in part and denies it in part.

## BACKGROUND

On August 29, 2018, Harvey filed a Second Amended Complaint on behalf of herself and a putative class of Ambetter policyholders alleging Defendants breached their contracts and violated the CPA by misrepresenting and making material omissions regarding the coverage actually provided by their Ambetter policy, which did not deliver the insurance services for which the Insurance Commissioner approved the premiums. *Id.*

The complaint alleges Defendants "target low-income customers who qualify for substantial government subsidies while simultaneously providing coverage well below both what is required by law and what [they] represent[] to customers." *Id.* at 5. "[T]he provider network [Defendants] represented was available to Ambetter policyholders was in material measure, if not largely, fictitious. Members have difficulty finding – and in many cases cannot find – medical providers who will accept Ambetter insurance." *Id.* Defendants "misrepresent[] the number, location, and existence of purported providers by listing physicians, medical groups, and other providers – some of whom have specifically asked to be removed – as participants in their network and by listing nurses and other non-physicians as

primary care providers." *Id.* "Defendants have even copied entire physician directories into their purported network lists for some areas, and have, in fact, listed medical students as part of their primary care provider network." *Id.* Defendants "listed those providers as being part of their network even though those providers were not actually part of the provider network for Ambetter." *Id.* at 19.

The complaint alleges "Defendants fail to disclose the true limitations of the coverage provided by its Ambetter policies." *Id.* at 6. "Defendants' sales materials omit the fact that [they] do[] not adequately monitor their network of providers. The Ambetter documentation also fails to disclose that [Defendants] do[] not consistently provide access to 'medically necessary care on a reasonable basis' without charging for out-of-network services." *Id.* Additionally, "Defendants routinely deny coverage for medical services, claiming that the provider did not show sufficient diagnostic evidence that the care was necessary." *Id.* at 20. "As a result of [Defendants] failing to pay providers for legitimate claims, a large number of medical providers reject Ambetter insurance, further reducing the provider network available to Ambetter's members." *Id.* at 6. "Defendants' provider network was and is so limited that holders of Ambetter policies would have to travel long distances to see a medical provider, if one legitimately within Defendants' network could be found at all." *Id.* at 19.

Harvey purchased Defendants' Ambetter policy in December 2016. *Id.* at 21.

In doing so, Harvey relied in part on Defendants' Ambetter plan brochure and plan summary. *See id.* at 21–22. These documents represent that the healthcare providers listed in Defendants' online directory are in network. *Id.* The documents "also purport to describe generally what services are covered and what are not, but are misleading by failing to indicate how few in-network providers would be available." *Id.* at 22. "For example, they indicate that emergency room services would be covered, although out-of-network charges might be incurred for out-of-network providers working in an otherwise covered emergency room. They fail to disclose, however, that in the Spokane area, during 2017, they had zero emergency room physicians who were in-network." *Id.* "Because Defendants failed to disclose that the limitations of the network coverage actually provided by the Ambetter policy fell far short of what they represented, Plaintiff . . . was forced to incur a charge of $1,544 for treatment received from an emergency room doctor." *Id.*

Defendants also failed to cover individual elements of Harvey's healthcare visits because they were out of network. *Id.* "For example, Plaintiff . . . received services from a covered doctor on March 17, 2017, but then received a bill from the lab used by that doctor. Similarly, Plaintiff . . . , who has been identified as high risk for colorectal cancer, was advised by Coordinated Care to get a colonoscopy. Colonoscopies are within the preventive services required by the [Patient Protection and Affordable Care Act] to be included in coverage and are identified as covered

in [Defendants'] Preventive Care brochure." *Id.* at 22. "When she got the colonoscopy from a covered doctor, however, her claims for two of the technicians involved in the procedure were denied." *Id.* at 22–23.

Harvey used Defendants' grievance and appeal process for each denial of coverage. *Id.* at 23. "In many cases, her appeal was ultimately successful, indicating that the initial denial of her claims was invalid. However, she was forced to complete the process of appeal, while providers were sending her bills and deeming her a credit risk." *Id.*

Putative class members "have had similar experiences, as admitted by Defendants in their May 17, 2018 letter to policyholders." *Id.* One putative class member "attempted to schedule an appointment with someone listed as a primary care physician on the provider network, only to find out that the person was a nurse practitioner" while "[a]nother person listed as a physician provider was a medical student." *Id.* at 23–24. Another putative class member "is a 60-year-old widow with medical issues" who "has consistently encountered difficulties with finding a medical provider willing to accept the Ambetter plan," which means "[s]he has to drive extraordinary distances to find a provider within Ambetter's network, an ordeal which can be insurmountable given her medical condition." *Id.* at 24.

The complaint alleges that, on December 12, 2017, the Insurance Commissioner ordered Coordinated Care to stop selling the 2018 Ambetter policy,

finding "sufficient evidence to indicate that the Company failed to monitor its network of providers, failed to report its inadequate network to the Insurance Commissioner, and failed to file a timely alternative access delivery request to ensure that consumers receive access to healthcare providers." *Id.* at 7–8. "The Insurance Commissioner intervened after receiving over 100 consumer complaints regarding a lack of doctors in the Ambetter policy network and other deficiencies and after doing its own investigation." *Id.* at 7. The Insurance Commissioner declared "Coordinated Care is legally required to provide access to 'medically necessary care on a reasonable basis' without charging for out-of-network services." *Id.* at 8. And the Insurance Commissioner ordered Coordinated Care to "no longer send customers 'surprise' bills, including charges for out-of-network care." *Id.*

Harvey alleges Defendants breached their insurance contracts by "failing to provide accurate information regarding their provider networks, failing to provide a sufficient network of providers, denying valid claims, failing to pay providers for valid claims, and collecting premiums while failing to provide an adequate network of providers that included emergency room physicians, labs used by in network providers and the like." *Id.* at 30; *see also id.* at 29. Harvey alleges she and the putative class "suffered damages as a direct and proximate result of Defendants' breach of contract, consisting of all of the amount of the premiums they paid as well

as the amounts they paid pursuant to improper billings by Defendants and expenses incurred in seeking or obtaining medical services." *Id.* at 30.

Harvey alleges Defendants engaged in unfair or deceptive acts or practices in conducting its insurance business by "failing to have sufficient providers within the Ambetter network as represented, . . . failing to pay legitimate medical claims on behalf of their insured, . . . failing to provide the benefits and coverage represented by Defendants to be within the plan, . . . failing to address Plaintiff's . . . complaints, . . . violating [applicable statutes and regulations], and . . . omitting material facts regarding the benefits and coverage of Ambetter policies." *Id.* at 32. Harvey alleges "[a]s a direct and proximate result of Defendants' unfair acts or practices, Plaintiff and Class members suffered injury in fact by paying insurance premiums but failing to receive benefits, paying out-of-pocket costs for services covered but not provided by the Ambetter plan, and spending time and money locating and traveling to providers willing to accept the Ambetter plan." *Id.* at 33.

For each claim, Harvey seeks compensatory or actual damages equal to

    i.     Benefit of the Bargain: a refund of the entire premium for the purchase of insurance that was not as represented and contracted for in order to restore Plaintiff and the Class to their position prior to purchasing the Ambetter policy; and/or

    ii.    Partial Refund: the difference in value between the value of the policy as represented and contracted for and the value of the policy as actually accepted and delivered; and/or

    iii.   Out-Of-Pocket Expenses: damages incurred as a result of having to pay for services that should have been covered by the Ambetter policy.

*Id.* at 33–34; *accord id.* at 31.

Harvey disavows any perceived challenge to the reasonableness of health insurance premiums approved by the Insurance Commissioner: "To be clear, Plaintiff . . . [is] not challenging the reasonableness of the rates filed with the Insurance Commissioner. Had [Defendants] actually delivered the insurance services for which its filed rates were approved by the [Insurance Commissioner], Plaintiff . . . would not assert a claim." *Id.* at 6–7.

The complaint alleges both Centene Management and Coordinated Care are wholly-owned subsidiaries of Centene Corporation, which is not a defendant to this civil action. ECF No. 48 at 2–4. Under a management services agreement between them, Centene Management "effectuates, controls and handles the operations" of Coordinated Care. *Id.* at 3. Specifically, Centene Management "provides the services necessary to manage the business operations" of Coordinated Care and "assumes responsibility for program planning and development, management information systems, financial systems and services, claims administration, provider and enrollee services and records, case management, care coordination, utilization and peer review, and quality assurance/quality improvement." *Id.* "To all intents and purposes the activities of Coordinated Care have been abdicated to Centene [Management] . . . which entirely controls the activities of Coordinated Care." *Id.* Thus, Coordinated Care is "a shell and alter ego" of Centene

Management, and the two "operate so in concert and together in a common enterprise and through related activities so that the actions of one may be imputed to the other." *Id.*

Defendants moved to dismiss Harvey's complaint on September 12, 2018. ECF No. 50. Harvey responded in opposition to the motion and Defendants replied in support of it. ECF Nos. 56, 58. The Court held a hearing regarding the motion on November 20, 2018.

## LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Federal Rule of Civil Procedure 12(b)(6), the Court must dismiss the complaint if it "fail[s] to state a claim upon which relief can be granted."

In deciding a Rule 12(b)(6) motion, the Court construes the complaint in the light most favorable to the plaintiff and draws all reasonable inferences in the plaintiff's favor. *Ass'n for L.A. Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011). Thus, the Court must accept as true all factual allegations contained in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the Court may disregard legal conclusions couched as factual allegations. *See id.*

To survive a Rule 12(b)(6) motion, the complaint must contain "*some* viable

legal theory" and provide "fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 562 (2007) (internal quotation marks and ellipsis omitted). Thus, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Facial plausibility exists where the complaint pleads facts permitting a reasonable inference that the defendant is liable to the plaintiff for the misconduct alleged. *Id.* Plausibility does not require probability but demands more than a mere possibility of liability. *Id.* While the complaint need not contain detailed factual allegations, threadbare recitals of a cause of action's elements, supported only by conclusory statements, do not suffice. *Id.* Whether the complaint states a facially plausible claim for relief is a context-specific inquiry requiring the Court to draw from its judicial experience and common sense. *Id.* at 679.

**B.    Breach-of-contract claim**

"A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995). An insurance contract includes a "duty to act in good faith," which requires that "an insurer must deal fairly with an insured, giving equal consideration *in all matters* to the insured's interests. *Tank v. State Farm Fire & Cas. Co.*, 715 P.2d 1133, 1136

(Wash. 1986). "The general rule regarding damages for an insurer's breach of contract is that the insured must be put in as good a position as he or she would have been had the contract not been breached." *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d 1124, 1126 (Wash. 1998). This is a benefit-of-the-bargain theory of damages. *See Benefit-of-the-Bargain Rule*, *Black's Law Dictionary* (10th ed. 2014). "[B]ecause an insurance contract is typically an agreement to pay money . . . recovery of damages is limited to the amount due under the contract plus interest." *Kirk*, 951 P.2d at 1126. Recoverable damages for breach of an insurance contract include the out-of-pocket expenses and other liabilities incurred as a result of the breach, provided the policy covers those amounts. *See id.*

**C. CPA claim**

"The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters." RCW 48.01.030. "Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance." *Id.* Thus, "[i]nsureds may bring a private action against their insurers for breach of the duty of good faith under the [CPA]." *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 930 P.2d 288, 296 (Wash. 1997).

The CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," RCW 19.86.020, and provides remedies for "[a]ny person

who is injured in his or her business or property by a violation of [this rule]," RCW 19.86.090. To prevail in a private CPA claim, the plaintiff must prove "(1) the defendant has engaged in an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) the plaintiff has suffered injury in his or her business or property, and (5) a causal link exists between the unfair or deceptive act and the injury suffered." *Leingang*, 930 P.2d at 296.

Remedies available under the CPA include injunctive relief, actual damages, attorney fees and costs, and, in the trial court's discretion, treble damages up to $25,000. RCW 19.86.090. "Damages, for purposes of the [CPA], must be broadly construed." *St. Paul Fire & Marine Ins. Co. v. Updegrave*, 656 P.2d 1130, 1133 (Wash. Ct. App. 1983); *see also Univ. of Wash. v. Gov't Emps. Ins. Co.*, 404 P.3d 559, 571 (Wash. Ct. App. 2017). "Even minimal injury is sufficient to meet the damages element of a CPA claim." *Univ. of Wash.*, 404 P.3d at 571 (citing *Mason v. Mortg. Am., Inc.*, 792 P.2d 142, 148 (Wash. 1990)). Damages are established "if the consumer's property interest or money is diminished because of the unlawful conduct even if the expenses . . . are minimal." *Mason*, 792 P.2d at 148. Even "nonquantifiable injuries" such as "loss of use of property" will suffice. *Id.*

## DISCUSSION

Initially, the Court confines its analysis to the complaint and excludes the extraneous documents submitted because they are unnecessary to assess the

complaint's sufficiency and the parties have not articulated adequate reasons for considering them at the pleading stage. *See generally Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99, 1002–03 (9th Cir. 2018) (discussing judicial notice and incorporation by reference at the Rule 12(b)(6) stage).

**A.    The filed rate doctrine does not preclude Harvey's claims.**

Harvey claims Defendants are liable for damages caused by their contract breaches and CPA violations. ECF No. 48. Defendants argue the filed rate doctrine precludes Harvey's claims because awarding the damages she seeks would require the Court to reevaluate health insurance premiums that the Insurance Commissioner approved. ECF No. 50 at 8–15. The Court explores the filed rate doctrine before applying it to Harvey's claims.

> **1.    The filed rate doctrine does not apply to claims that are merely incidental to and do not directly attack Insurance Commissioner-approved health insurance premiums.**

In Washington state, health insurance premiums must be approved by the Insurance Commissioner. *McCarthy Fin., Inc. v. Premera*, 347 P.3d 872, 873, 875 (Wash. 2015). Under the filed rate doctrine, "once an agency approves a rate, such as a health insurance premium, courts will not reevaluate that rate because doing so would inappropriately usurp the agency's role."[1] *Id.* at 873. "However, courts may

---

[1] "The 'filed rate' doctrine . . . is a court-created rule to bar suits against regulated utilities involving allegations concerning the reasonableness of the filed rates." *McCarthy Fin., Inc.*, 347 P.3d at 875 (quoting *Tenore v. AT & T Wireless Servs.*,

consider claims that are related to rates approved by an agency but do not require the courts to reevaluate such rates." *Id.* "In most cases, . . . courts must consider . . . CPA . . . claims alleging general damages merely related to agency-approved rates." *Id.* But a court should dismiss claims for "specific damages the award of which would require a court to reevaluate the reasonableness of health insurance premiums approved by the [Insurance Commissioner]." *Id.* The issue is whether Harvey's claims fall within the scope of the filed rate doctrine.

In *McCarthy Finance*, the Washington State Supreme Court affirmed dismissal of a class action complaint alleging the defendants violated the CPA by "collud[ing] and ma[king] false and misleading representations to the plaintiffs that induced the plaintiffs to purchase health insurance policies under false pretenses." *Id.* at 873–74. The plaintiffs alleged that the defendants' CPA violations caused them to pay "excessive, unnecessary, unfair and deceptive overcharges for health insurance," which enabled the defendants to obtain millions of dollars in profits and amass a surplus of approximately $1 billion. *Id.* at 874. The plaintiffs sought "only two specific forms of damages." *Id.* First, "for the 'unfair business practices and excessive overcharges for premiums,' the plaintiffs request[ed] 'the sum of the

---

962 P.2d 104, 108 (Wash. 1998)). "This doctrine provides, in essence, that any 'filed rate'—a rate filed with and approved by the governing regulatory agency— is per se reasonable and cannot be the subject of legal action against the private entity that filed it." *Id.* (quoting *Tenore*, 962 P.2d at 108).

excess premiums paid to the defendants,' in other words, a 'refund[] of the gross and excessive overcharges in premium payments.'" *Id.* (second alteration in original). Second, "'[i]f the surplus [wa]s excessive and unreasonable,' the plaintiffs assert[ed] that 'the amount of the excess surplus should be refunded to the subscribers who have paid the high premiums causing the excess.'" *Id.* (first alteration in original).

The court held the filed rate doctrine barred the plaintiffs' CPA claims because awarding the two specific forms of damages they sought—a refund of either the gross and excessive overcharges in premium payments or the amount of the excess surplus—would require a judicial determination of "what health insurance premiums would have been reasonable for the[m] to pay as a baseline for calculating the amount of damages," which would be inappropriate because the Insurance Commissioner had already determined that the premiums they paid were reasonable. *Id.* at 876. In short, "awarding the specific damages requested by the plaintiffs would require a court to inappropriately substitute its judgment for that of the [Insurance Commissioner]." *Id.* at 873.

In so holding, the court distinguished between claims that "are merely incidental to agency-approved rates" and those that "would necessarily require courts to reevaluate agency-approved rates." *Id.* at 875. The court specified that the filed rate doctrine precludes only the latter type of claim. *Id.* As the court reasoned,

"[t]he mere fact that a claim is related to an agency-approved rate is no bar." *Id.*
The court suggested the filed rate doctrine does not preclude claims "requesting general damages or seeking any damages that do not directly attack agency-approved rates." *Id.* at 875–76.

Further, the court noted the legislative mandate to construe the CPA liberally. *Id.* Thus, the court concluded, "[i]n most cases, courts must consider CPA claims even when the requested damages are related to agency approved rates." *Id.* As the court reasoned, "to the extent that claimants can prove damages without attacking agency-approved rates, the benefits gained from courts' considering CPA claims outweigh any benefit that would be derived from applying the filed rate doctrine to bar the claims." *Id.*

Upon reviewing *McCarthy Finance*, the Court concludes Washington state law is clear: the filed rate doctrine does not apply to claims that are merely incidental to and do not directly attack Insurance Commissioner-approved health insurance premiums. Thus, the Court denies the parties' request to certify a question to the Washington State Supreme Court. ECF No. 56 at 17; ECF No. 58 at 9.

**2.      Harvey's claims are merely incidental to and do not directly attack Insurance Commissioner-approved health insurance premiums.**

Harvey disavows any perceived challenge to the reasonableness of health insurance premiums approved by the Insurance Commissioner: "To be clear, Plaintiff . . . [is] not challenging the reasonableness of the rates filed with the

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT - 16

Insurance Commissioner. Had [Defendants] actually delivered the insurance services for which its filed rates were approved by the [Insurance Commissioner], Plaintiff . . . would not assert a claim." ECF No. 48 at 6–7. Defendants argue this disclaimer is belied by the damages Harvey seeks. ECF No. 50 at 8–15.

Harvey seeks compensatory or actual damages equal to either (1) the "Benefit of the Bargain," meaning "a refund of the entire premium for the purchase of insurance that was not as represented and contracted for in order to restore Plaintiff and the Class to their position prior to purchasing the Ambetter policy;" (2) a "Partial Refund," meaning "the difference in value between the value of the policy as represented and contracted for and the value of the policy as actually accepted and delivered;" or (3) all "Out-Of-Pocket Expenses," meaning "damages incurred as a result of having to pay for services that should have been covered by the Ambetter policy." ECF No. 48 at 33–34; *accord id.* at 31.

While Harvey's claims are certainly related to health insurance premiums approved by the Insurance Commissioner, they do not require the Court to reevaluate the reasonableness of such premiums. Instead, Harvey assumes the reasonableness of the premiums and uses them as a proper baseline for calculating the amount of damages. Harvey does not allege the premiums were too high but instead alleges Defendants misrepresented and made material omissions regarding the coverage actually provided by their Ambetter policy, which did not deliver the

insurance services for which the Insurance Commissioner approved the premiums. *Id.* at 7. Awarding the damages Harvey seeks would not require the Court to determine what premiums would have been reasonable. In short, awarding the damages Harvey requests would not require the Court to inappropriately substitute its judgment for that of the Insurance Commissioner.

Harvey's claims are unlike those in *McCarthy Finance*. That case turned on the plaintiffs' allegations that the premiums they paid the defendants were too high compared to the services they received. "A very different case is presented by a class of plaintiffs that is perfectly happy to pay the rate set by the [Insurance Commissioner] *provided that the regulated entity lives up to its contractual and legal obligations under that rate schedule.*" Kaleigh Powell, *"A Nuanced Approach": How Washington Courts Should Apply the Filed Rate Doctrine*, 92 Wash. L. Rev. 481, 513–14 (2017). In this alternative type of case, the plaintiffs do not allege their premiums are too high but rather allege either that they did not receive the services the defendants promised them or that the defendants committed some sort of consumer protection violation. *Id.* at 514. Here, Harvey's claims fit more closely with this alternative type of case than with *McCarthy Finance*.

Considering all, the Court concludes that Harvey's claims are merely incidental to and do not directly attack Insurance Commissioner-approved health insurance premiums. But even if the Court were "skeptical that these damages can

be measured in a way that does not violate the filed-rate doctrine," the Court acknowledges "the better practice is to address this issue at summary judgment or trial, rather than at the pleading stage." *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 198 F. Supp. 3d 1183, 1204 (D. Or. 2016) (declining, at the Rule 12(b)(6) stage, to apply the filed rate doctrine to dismiss a class action complaint based on a data security breach of the defendants' computer network where the plaintiffs alleged they suffered "actual damages in an amount equal to the difference in the free-market value of the secure healthcare insurance for which they paid and the insecure healthcare insurance they received").

**B.   Harvey states an adequate CPA claim against Centene Management but she fails to state an adequate breach-of-contract claim against it.**

Centene Management argues Harvey cannot pierce the corporate veil to hold it liable because she does not adequately plead that it is Coordinated Care's alter ego. ECF No. 50 at 19–23. Harvey sues both Centene Management and Coordinated Care directly, alleging they are each responsible for their individual and joint actions. *Id.* at 3.

Certainly, Centene Management is responsible for its own actions to the extent it "participate[d] in the wrongful conduct, or with knowledge approve[d] of the conduct." *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 553 P.2d 423, 439 (Wash. 1976). Harvey adequately pleads that Centene Management did so here. But that fact only establishes liability for the alleged CPA violations because

Centene Management could not breach a contract to which it was not a party.[2] *See generally Havens v. C & D Plastics, Inc.*, 842 P.2d 975, 984 (Wash. Ct. App. 1992) ("[A]n agent acting within the scope of . . . authority and in contractual matters is not individually liable."), *rev'd in part on other grounds*, 876 P.2d 435 (Wash. 1994); *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1097 (9th Cir. 2007) ("An agent is always liable for breaching an independent obligation that the agent owes to the injured party, in spite of the fact that the agent may have acted in accordance with a principal's instructions."). At oral argument, Harvey conceded the Court should dismiss Centene Management as a breach-of-contract defendant. Therefore, the Court does not reach Centene Management's alter ego argument.

The Court concludes Harvey states a facially plausible CPA claim against Centene Management but she fails to state a facially plausible breach-of-contract claim against it. While the Court dismisses Harvey's breach-of-contract claim against Centene Management, it does so without prejudice because Harvey requests leave to amend the complaint and expects discovery to reveal more details regarding "the ways in which the two corporate entities interacted, comingled, or disregarded the corporate form." ECF No. 56 at 25–26.

---

[2] While the complaint alleges Harvey had a "valid and binding written contract[] with *Defendants* for the purchase of Ambetter insurance policies," ECF No. 48 at 29 (emphasis added), it elsewhere clarifies that she purchased this policy from Coordinated Care only, *id.* at 2.

## C. Harvey states an adequate breach-of-contract claim against Coordinated Care.

Coordinated Care argues Harvey's allegations do not establish a breach because the contract contains a grievance and appeal process for resolving coverage disputes. ECF No. 50 at 16–17. Similarly, Coordinated Care argues Harvey's allegations do not establish a breach because the contract contains a caveat that the insurer may bill the insured for services rendered by an out-of-network healthcare provider working within an in-network emergency department. *Id.* at 17.

"[I]t would be premature at the motion to dismiss stage for the Court to delve into contractual interpretation . . . checking each term of the contract against each factual allegation in the complaint." *Seitz v. Rheem Mfg. Co.*, 544 F. Supp. 2d 901, 910 (D. Ariz. 2008). "At the motion to dismiss stage the Court does not engage in debating the terms of the applicable contract. Rather, the Court is only concerned with whether the Complaint alleges facts that, if proven, are sufficient to state a claim for relief." *Gordon v. Impulse Mktg. Grp., Inc.*, No. CV-04-5125-FVS, 2006 WL 624838, at *4 (E.D. Wash. Mar. 9, 2006). Harvey's allegations that Coordinated Care breached the contract and caused damages are sufficient to allow her to offer evidence in support of her claim. *See Seitz*, 544 F. Supp. 2d at 910; *Hart v. CF Arcis VII LLC*, No. C17-1932RSM, 2018 WL 3656300, at *6 (W.D. Wash. Aug. 2, 2018); *Carnahan v. Alpha Epsilon Pi Fraternity, Inc.*, No. C17-86RSL, 2017 WL 5629502, at *3 (W.D. Wash. Nov. 22, 2017).

Coordinated Care argues it lacks notice of how it allegedly breached the contract because Harvey does not articulate how the healthcare provider network was inadequate. ECF No. 50 at 16. But Harvey described the alleged deficiencies with sufficient detail to give Coordinated Care fair notice of what her claim is and what grounds her claim rests upon. *See* ECF No. 48 at 5–8, 16–24, 29–30.

Coordinated Care identifies two reasons why it believes Harvey has not alleged viable theories of damages for breach of contract. ECF No. 50 at 18. First, Coordinated Care argues Harvey is not entitled to a full refund of the premiums she paid because she received at least some valuable services in exchange. *Id.* Indeed, Harvey misconceives the benefit of the bargain as "a refund of the entire premium for the purchase of insurance that failed to provide the contracted for benefits in order to restore Plaintiff and the Class to their position prior to purchasing the Ambetter policy." ECF No. 48 at 31. For breach of contract, the goal of compensatory damages is "not a mere restoration to a former position, as in tort, but the awarding of a sum which is the equivalent of performance of the bargain— the attempt to place the plaintiff in the position he would be in if the contract had been fulfilled." *Rathke v. Roberts*, 207 P.2d 716, 720 (Wash. 1949) (emphasis omitted); *accord Oberto v. Platypus Marine, Inc.*, No. 3:16-CV-05320-BHS, 2018 WL 1022704, at *7 (W.D. Wash. Feb. 22, 2018). Thus, the injured party is "not entitled to be placed in a better position than he would have been in if the contract

had not been broken." *Rathke*, 207 P.2d at 721; *accord Oberto*, 2018 WL 1022704, at *7.

While a full refund of health insurance premiums could constitute a windfall, it is also possible Coordinated Care's alleged breach of contract caused putative class members to either incur unjustified out-of-pocket expenses exceeding all premiums paid or forego healthcare entirely because none was reasonably available in network even after all premiums were paid. Thus, regardless of labels, a full refund of health insurance premiums could be a proper measure of damages to the extent it is less than or equal to the contract expectancy. But Harvey has not alleged such facts here. Therefore, the Court concludes that, for Harvey's breach-of-contract claim, the proper measure of compensatory damages based on the benefit-of-the-bargain rule is a sum equivalent to performance of the contract that places Harvey and the putative class in the position they would occupy if Coordinated Care had fulfilled the contract rather than breached it. Harvey shall amend the complaint to make this correction no later than November 30, 2018.

Second, Coordinated Care argues it lacks notice of what damages it allegedly caused because Harvey's theories of damages leave "undefined" exactly what premiums were paid and what out-of-pocket expenses were incurred. ECF No. 50 at 18. Coordinated Care is incorrect. Construing the complaint in the light most favorable to Harvey and drawing all reasonable inferences in her favor, the Court

concludes she alleges a facially plausible breach-of-contract claim. Moreover, the Court concludes Harvey bases this claim on viable theories of damages that are familiar under Washington state law—compensatory damages equal to the benefit of the bargain had the contract not been breached, the difference between the contract price and the reduced value of the services received, or the out-of-pocket expenses incurred as a result of the breach. Harvey need not allege precise figures of premiums paid and out-of-pocket expenses incurred for Coordinated Care to receive fair notice of what damages it allegedly caused.

Considering all, the Court concludes Harvey states an adequate breach-of-contract claim against Coordinated Care.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendants' Motion to Dismiss Second Amended Complaint, **ECF No. 50**, is **GRANTED IN PART** and **DENIED IN PART**.

   *A.* The breach-of-contract claim against Centene Management Company LLC is **DISMISSED WITHOUT PREJUDICE**.

   *B.* For the breach-of-contract claim against Coordinated Care Corporation, the **proper measure** of compensatory damages based on the benefit-of-the-bargain rule is a sum equivalent to performance of the contract that places the injured party in the position he or she would occupy if the contract had been fulfilled

rather than breached. Plaintiff shall **AMEND** the complaint to make this correction no later than **November 30, 2018**.

      *C.*    All other claims may **PROCEED** as alleged.

      **IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

      **DATED** this 21st day of November 2018.

_____
SALVADOR MENDOZA, JR.
United States District Judge

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT - 25