Beth E. Terrell, WSBA #26759
Jennifer R. Murray, WSBA #36983
Elizabeth A. Adams, WSBA #49175
Attorneys for Plaintiff and the Class
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450
Email: bterrell@terrellmarshall.com
Email: jmurray@terrellmarshall.com
Email: eadams@terrellmarshall.com

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WASHINGTON

CYNTHIA HARVEY, individually and
on behalf of all others similarly situated,

    Plaintiff,

v.

CENTENE MANAGEMENT
COMPANY, LLC and COORDINATED
CARE CORPORATION,

    Defendants.

NO. 2:18-cv-00012-SMJ

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Note on Motion Calendar:
April 14, 2020, 9:00 a.m.
Location:  Spokane

**REDACTED PUBLIC VERSION**

# TABLE OF CONTENTS

Page No.

I.   INTRODUCTION ................................................................ 1

II.  STATEMENT OF FACTS ................................................... 3

    A.   Defendants sell Centene's Ambetter health insurance plan
        on the Washington Benefit Health Exchange ....................... 3

    B.   Centene is required to maintain an adequate provider
        network and to protect members from improper billing .................... 4

    C.   Coordinated Care's member contracts require Defendants
        to provide an adequate network and to disclose in-network
        providers .................................................................... 7

        1.   Centene systematically violates Washington law and
            breaches its member contracts by failing to maintain
            an adequate provider network and by permitting
            improper billing .................................................. 9

        2.   Centene allows improper billing ............................... 9

        3.   Centene fails to disclose is network inadequacies to
            insureds and fails to notify insured of their basic
            consumer rights ................................................. 11

        4.   Plaintiff's expert, Leslie Krier agrees that health insurers
            must monitor and disclose inadequacies ................. 14

    D.   Centene's inadequate provider network injured Plaintiff Harvey
        and other Ambetter members ......................................... 15

III. AUTHORITY AND ARGUMENT ...................................... 16

    A.   The Rule 23(a) requirements are satisfied ........................ 18

        1.   Numerosity is satisfied ......................................... 19

2.    Commonality is satisfied ............................................................ 19

3.    Typicality is satisfied................................................................. 19

4.    Adequacy is satisfied ............................................................... 20

B.    The Rule 23(b)(3) requirements are satisfied..................................... 21

1.    Common issues predominate over any individual issues ........ 22

2.    Class certification is superior to any alternative ....................... 31

IV.  CONCLUSION............................................................................................ 32

# TABLE OF AUTHORITIES

**Page No.**

## FEDERAL CASES

*Abdullah v. U.S. Sec. Assoc., Inc.,*
731 F.3d 952 (9th Cir. 2013) .................................................. 19, 20

*Amchem Prods. Inc. v. Windsor,*
521 U.S. 591 (1997) ............................................................ 22, 23

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
568 U.S. 455 (2013) ............................................................ 18, 23

*Briseno v. ConAgra Foods, Inc.,*
844 F.3d 1121 (9th Cir. 2017) ....................................................... 32

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013) ........................................................................ 30

*Dunakin v. Quigley,*
99 F. Supp. 3d 1297 (N.D. Cal. 2015) ........................................... 19

*Durant v. State Farm Mut. Auto. Ins. Co.,*
No. 2-15-cv-01710-RAJ, 2017 WL 950588 (W.D. Wash. Mar. 9, 2017) .... 24

*Edwards v. First Am. Corp.,*
798 F.3d 1172 (9th Cir. 2015) ....................................................... 19

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (9th Cir. 2011) ............................................. 18, 19, 21

*Erica P. John Fund, Inc. v. Halliburton,*
563 U.S. 804 (2011) ............................................................ 23, 24

*Lozano v. AT&T Wireless Servs., Inc.,*
504 F.3d 718 (9th Cir. 2007) ....................................................... 21

*Meyer v. Am. Family Mut. Ins. Co.*,
    No. 3:14-CV-05305-RBL, 2015 WL 5156594 (W.D. Wash.
    Sept. 2, 2015) ........................................................................... 29, 30

*Nguyen v. Nissan N. Am., Inc.*,
    932 F.3d 811 (9th Cir. 2019)........................................................... 30

*Pulaski & Middleman, LLC v. Google*,
    802 F.3d 979 (9th Cir. 2015)..................................................... 29, 30

*Reichert v. Keefe Commissary Network, L.L.C.*,
    331 F.R.D. 541 (W.D. Wash. 2019) ......................................... 26, 29

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010)......................................................... 19

*Torres v. Mercer Canyons, Inc.*,
    305 F.R.D. 646 (E.D. Wash. 2015) ............................................... 27

*Torres v Mercer Canyons, Inc.*,
    835 F.3d 1125 (9th Cit. 2016) ................................................. 27, 28

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ............................................................ 23, 30

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................................... 20

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010)......................................... 21, 31, 32

*Yokoyama v. Midland Nat. Life Ins. Co.*,
    594 F.3d 1087 (9th Cir. 2010)....................................................... 26

## STATE CASES

*Ambach v. French*,
    167 Wn.2d 167 (2009)................................................................... 28

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,*
   105 Wn.2d 778 (1986) ...................................................................... 24, 27, 28

*Klem v. Wash. Mut. Bank,*
176 Wn.2d 771 (2013) ...................................................................... 24, 25

*Panag v. Farmers Ins. Co. of Wash.,*
   166 Wn.2d 27 (2009) ...................................................................... 24, 26, 27

*Rush v. Blackburn,*
   190 Wn. App. 945 (2015) ............................................................. 27

*Salois v. Mutual of Omaha Ins. Co.,*
   90 Wn.2d 355 (1978) ...................................................................... 25, 26, 27

*Schnall v. AT&T Wireless Servs., Inc.,*
   171 Wn.2d 260 (2011) ..................................................................... 28

*Valentino v. Carter-Wallace, Inc.,*
   97 F.3d 1227 (9th Cir. 1996) .......................................................... 32

## FEDERAL STATUTES

42 U.S.C. § 18022 ................................................................................. 4

42 U.S.C. § 300gg-13 .......................................................................... 4

## STATE STATUTES

RCW 48.30.040 ..................................................................................... 25

RCW 48.43.093 ..................................................................................... 6

RCW 48.44.080 ..................................................................................... 5

RCW 48.46.030 ..................................................................................... 5

1

## FEDERAL RULES

2

45 C.F.R. § 147.200(a)(2) ........................................................................ 5

3

Fed. R. Civ. P. 23(a)(1) .......................................................................... 19

4

Fed. R. Civ. P. 23(a)(4) .......................................................................... 21

5

Fed. R. Civ. P. 23(b)(3) ..................................................................... 22, 31

6

Fed. R. Civ. P. 23(g)(1)(C) ..................................................................... 21

7

## STATE RULES

8

WAC 284-43B-020 .................................................................................... 7

9

WAC 284-170-200(5) ............................................................................... 6

10

WAC 284-170-200(8) ............................................................................... 5

11

WAC 284-170-201(1) ............................................................................... 5

12

WAC 284-170-210 .................................................................................. 25

13

WAC 284-170-260 .................................................................................... 5

14

WAC 284-170-270 .................................................................................... 5

15

WAC 284-170-280 .................................................................................... 6

16

WAC 284-170-280(3)(a)(iii) ................................................................. 5, 6

17

18

19

20

# I. INTRODUCTION

Defendants Centene Management Company, LLC, and Coordinated Care Corporation promised to provide both an adequate network of health care providers and an accurate listing of such providers for their "family" of health plans that they sell on the Washington health care exchange under the name of Ambetter. From the time Defendants started selling Ambetter in Washington, members have complained that they are not able to find providers who accept Ambetter insurance for services they need. One Ambetter member contacted Defendants because he could not find an in-network kidney dialysis center in Spokane, Washington. Even though the Ambetter plan covered the dialysis, Defendants informed him that the plan didn't have any in network dialysis centers in the area. Ex. 1.[1] Another Ambetter member suffered from an allergic reaction. After trying for two days to find a doctor that accepted Ambetter insurance, the member was forced to go to an out-of-network emergency room. When the emergency room submitted a claim for reimbursement, Ambetter denied the claim and the emergency room billed the member for the balance. The member appealed but, contrary to Washington law and Defendant's contract, he was told that the bill was "his to pay." See Ex. 2. Like

---

[1] All exhibit references unless otherwise noted are the exhibits attached to the Declaration of Beth E. Terrell.

these class members, Plaintiff Harvey received numerous improper bills from Ambetter. Only after persistently complaining and appealing Defendants' denials of coverage did Plaintiff Harvey resolve some, but not all, of her disputes with Defendants.

These are not isolated incidents. Defendants have systematically failed to provide the coverage promised to their members, charging them thousands of dollars per year to maintain policies that don't give them access to the provider network and services they were promised. Defendants also fail to protect members from out-of-network charges and balance billing. In December 2017, the OIC imposed a $1.5 million fine and required Defendants to stop selling the 2018 Ambetter plans. In resolving the OIC's charges, Coordinated Care admitted to the deficiencies in its provider network and its own documents reveal compelling evidence that known adequacy issues remain, including in the largest counties in Washington State.

Plaintiff Harvey moves for certification of a class defined as all persons in the state of Washington who were insured by Coordinated Care's Ambetter insurance product from January 11, 2012 to the present. The proposed class satisfies the numerosity, commonality, typicality and adequacy requirements of Rule 23(a). The Rule 23(b)(3) requirements are satisfied because numerous questions of law and fact common to all class members predominate over any individual issues, and class

treatment is superior to any alternative method for addressing Plaintiff's Consumer Protection Act and breach of contract claims. Plaintiff therefore requests that the Court grant her motion for class certification.

## II.  STATEMENT OF FACTS

**A.    Defendants sell Centene's Ambetter health insurance plan on the Washington Benefit Health Exchange.**

Centene Corporation advertises itself as the "number one insurer in the nation on the Health Insurance Marketplace." Ex. 3. A holding company that itself has no employees, Centene Corporation has steadily expanded its operations across the country, earning $40.6 billion in gross revenues in 2016, $48.4 billion in gross revenues in 2017, and $60.1 billion in gross revenues in 2018. *See* Ex. 4. Through the third quarter of 2019, Centene Corporation reported $402 million in adjusted net earnings. *See* Ex. 5.

Coordinated Care and Centene Management are subsidiaries of Centene Corporation. Ex. 6 at 7:2-9. Coordinated Care is responsible for administering the Ambetter insurance plans in Washington and Centene Management provides the employees who operate the company on behalf of the plan. *Id.* at 7:8-23. Plaintiff will refer to Defendants collectively as "Centene" because all of Coordinated Care's actions are done through Centene Management employees.

Centene currently offers the Ambetter plan in nineteen Washington counties. https://ambetter.coordinatedcarehealth.com/health-plans/coverage-map.html. Since

2012, Centene has sold ███ Ambetter policies to Washington residents.
Declaration of Jodi Nuss Schexnaydre in Support of Class Certification
("Schexnaydre Decl.") ¶ 10. Coordinated Care has produced data documenting
claims submitted on behalf of ███ Ambetter members. *Id.* A "claim" is a bill for
services that a provider submits to Defendants so the provider can be paid. *See* Ex. 6
at 50:5-17.

Centene charges hefty premiums for its insurance, which the federal
government subsidizes. The amount of the subsidy varies based on the member's
documented income. *See* Ex. 6 at 254:8-255:3. On average, Ambetter members
paid approximately ███ per month. Schexnaydre Decl. ¶ 12. Between 2015 and
2018, Coordinated Care earned approximately $496,902,590 in premium dollars
from Washington residents. *See* Exs. 7-10.

**B.    Centene is required to maintain an adequate provider network and to protect
members from improper billing.**

The Affordable Care Act (ACA) requires health plans offered in the
marketplace to cover ten categories of "essential health benefits" with limited cost-
sharing, including ambulatory patient services, emergency services, hospitalization,
pregnancy, maternity and newborn care, mental health and substance use disorder
services, prescription drugs, rehabilitative services and devices, laboratory services,
preventive and wellness services, chronic disease management, and pediatric
services. 42 U.S.C. § 18022; 42 U.S.C. § 300gg-13. The plans must maintain "a

network that is sufficient in number and types of providers" so that "all services will be accessible without unreasonable delay." 45 C.F.R. § 156.230(b)(2). They must also provide a current and accurate summary of benefits and coverage to subscribers. 45 C.F.R. § 147.200(a)(2).

Washington imposes additional requirements. ACA insurers must provide "a comprehensive range of primary, specialty, institutional and ancillary services" that "are readily available" to subscribers. WAC 284-170-201(1); WAC 284-170-270. Provider networks must have a sufficient number of certain professionals, such as women's health care practitioners (RCW 48.42.100), primary care doctors (WAC 284-170-200(1)), and mental health providers (WAC 284-170-200(11)). Subscribers must have adequate choice of providers. WAC 284-170-200(2). Health plans must disclose limitations on access to network providers and must update provider directories at least monthly. WAC 284-170-200(8); WAC 284-170-260.

Washington requires health plans to monitor their provider networks to ensure that they are adequate and to report network status to the OIC. Health plans must file annually a list of participating providers with whom the insurer has executed contracts of participation. RCW 48.44.080; WA 284-170-280(3)(a). Health plans also must provide to the OIC a description of the geographic and population groups to be served and the size and composition of the enrollee population. RCW 48.46.030. Each month or more frequently if there is a material change to the

network, health plans must submit an updated, accurate list of participating

providers. WAC 284-170-280(3)(a)(iii). Health plans also must submit to OIC a

"geomap" identifying provider locations and demonstrating that each enrollee in the

service area has adequate access to hospital and emergency services; primary care

providers; mental health and substance use disorder providers; pediatric services;

specialty services; therapy services; home health, hospice, vision, and dental

providers; covered pharmacy dispensing services; and essential community

providers. WAC 284-170-280.

If an insurer's network is inadequate, the insurer has an affirmative duty to

protect its insureds from paying more for out-of-network care than the insureds

would have paid had they received care from an in-network provider. *See* WAC

284-170-200(5). Washington law requires insurers to protect members from

improper "balance" or "surprise" billing regardless of network adequacy. Until

January 1, 2020, Washington prohibited out-of-network providers from billing

insureds more than $50 for the difference in cost sharing amounts applied to

emergency services rendered by participating providers and non-participating

providers. *See* RCW 48.43.093. No cost differential was permitted for emergency

services if "the covered person was unable to go to a participating hospital

emergency department in a timely fashion without serious impairment to the

covered person's health." *See id.* Under the law, "emergency services" includes

1  "ancillary services routinely available to the emergency department of a hospital."

2  *Id.*[2]

3  **C.    Coordinated Care's member contracts require Defendants to provide an adequate network and to disclose in-network providers.**

4  Coordinated Care enters into a contract with members called "Evidence of

5  Coverage" in which Coordinated Care promises to provide certain healthcare

6  benefits to members in consideration for timely payment of premiums. Ex. 11 at 1.

7  Coordinated Care represents that members have the right to be "kept informed of"

8  among other things "covered and non-covered services, program changes, how to

9  access services, Primary Care Provider assignment, Providers, advance directive

10

---

11  [2] Washington's legislature recently approved even stronger protections for

12  consumers by passing the Balance Billing Protection Act, which took effect on

13  January 1, 2020. The Act prohibits providers from billing insureds the difference

14  between what the insurer pays and the amount the provider or facility bills when the

15  insured obtains emergency services or when a customer receives surgery, anesthesia,

16  pathology, radiology, laboratory, or hospitalist services from an out-of-network

17  provider while the consumer is at an in-network hospital or outpatient surgical

18  facility. *See* WAC 284-43B-020. In these circumstances, the consumer may be billed

19  only her in-network cost-sharing amount and the insurer must hold the consumer

20  harmless from balance billing. *Id.*

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 7
CASE NO. 2:18-CV-00012-SMJ

1    information, referrals and Authorizations, [and] benefit denials." *Id.* at 3.

2         Members also have a right to a "current list of Network Providers" and

3    "[a]dequate access to qualified Physicians and medical Practitioners and treatment or

4    services regardless of age, race, creed, sex, sexual preference, family structure,

5    geographic location, health condition, [or] national origin or religion." *Id.* And

6    members have a right to "[a]ccess Medically Necessary urgent and Emergency

7    Services 24 hours a day and seven days a week." *Id.* at 4.

8         Coordinated Care specifically informs members that a "listing of Network

9    Providers is available online at Ambetter.CoordinatedCareHealth.com." *Id.* at 5.

10   Members can access the directory by using the "Find a Provider tool." *Id.*

11   Coordinated Care represents that the Find a Provider tool allows the member to

12   access information about a provider's "specialty, zip code, gender, whether they are

13   currently accepting new patients, and languages spoken." *Id.* According to

14   Coordinated Care, the tool should allow the member to learn the provider's

15   "address, phone number, office hours, and qualifications." *Id.*

16

17

18

19

20

**C.    Centene systematically violates Washington law and breaches its member contracts by failing to maintain an adequate provider network and by permitting improper billing.**

1.    Centene's provider network is inadequate.

Centene has been on notice for years that thousands of Washington Ambetter members have not had access to reasonably accessible in-network providers for health care services as required under Washington law. As early as 2014, members complained that ███████████████████████████████████████████████ ████████████████████████████████████ Schexnaydre Decl. ¶ 49-52. In 2016 and 2017, ██████████████████████████ *Id.*

Centene's claims data also reveals long time network inadequacies. For example, Centene's records show that ████████████████████████████ ████████████████████████████████ Schexnaydre Decl. ¶ 31. ██████████ ████████████████████████████████████ ███████████████████████████████ *Id.*

In the fall of 2017, the OIC informed Centene that it had received "over one hundred (100) consumer complaints related to Coordinated Care's inadequate network, such as insufficient anesthesiologists and out-of-network charges" in a

seven-month period in 2016 and 2017. Ex. 12 at 2. The OIC ultimately entered a

Consent Order finding "sufficient evidence to indicate that [Coordinated Care] failed

to monitor its network of providers, failed to report its inadequate network to the

Insurance Commissioner, and failed to file a timely alternative access delivery

request ("AADR") to ensure that consumers receive access to healthcare providers."

*Id.* The OIC concluded that Coordinated Care violated multiple provisions of the

insurance law and materially breached its obligation to furnish the health care

services specified in its contracts with consumers. *Id.* at 4-7. The OIC declared that

"Coordinated Care is legally required to provide access to 'medically necessary care

on a reasonable basis' without charging for out-of-network services." *Id.*

After the OIC entered the Consent Order, Centene reported network

deficiencies to the OIC in eleven separate specialties, submitting AADRS for: (1)

contract hospitals using anesthesiologists not contracted by Coordinated Care; (2)

emergency room physicians; (3) acute care hospitals and specialties; (4) Kittitas

County; (5) Columbia County; (6) birthing centers; (7) dialysis; (8) ambulance

services; (9) hospital services; (10) adult specialties; and (11) pediatric specialties. *See*

Exs. 13 – 29. The AADRs identified deficiencies in every county in which Centene

does business in Washington state. *See id.*

To this day, Centene does not have an adequate network of ambulance

drivers (Ex. 30 at 120:17-23) nor does it have an in-network trauma hospital because

1    Harborview Hospital — the only trauma hospital in the state — refuses to contract

2    with Coordinated Care (*Id.* at 122:5-15). Defendants also do not have an adequate

3    network of hospital-based anesthesia services in Thurston County (Ex. 31) or an

4    adequate network of emergency room physicians in King and Spokane Counties

5    (Ex. 32).

6         2.    <u>Centene fails to protect its members from improper billing.</u>

7         A balance bill or surprise bill occurs when a provider or facility is not a

8    member of the Ambetter network. These "out-of-network" or "non-participating"

9    providers or facilities can bill a member for the difference between what Centene

10   pays for comparable services and the amount the out-of-network provider or facility

11   actually bills. *See* https://www.insurance.wa.gov/what-consumers-need-know-about-

12   surprise-or-balance-billing; *see also* Ex. 33.

13        In-network providers, however, may not balance bill. *See* Ex. 6 at 109:2-110:2.

14   And where out-of-network services are provided at in-network of facilities, the most

15   an insured can be billed is the in-network cost-sharing amount and the providers

16   cannot bill the consumers for any difference. Ex. 30 at 179:23-180:14 & Ex. 34. The

17   same goes for emergency services—the most an insured can be billed for emergency

18   services is the plan's in-network cost-sharing amount, even if the insured receives

19   services at an out-of-network facility. Ex. 35. When an insurer has an inadequate

20   network, it must cover any out-of-network services at the in-network rate. *See* Ex. 6

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 11
CASE NO. 2:18-CV-00012-SMJ

at 108:4-13; *see also* Ex. 36 at 4 (prohibiting Coordinated Care from enacting a corrective action plan where the consumer pays more than the in-network rate).

Centene systematically fails to protect members from balance billing when its provider network is inadequate.[3] For example, in December 2017 the OIC directed Centene to pay "100% of billed charges" to the out of network providers" of anesthesia in King, Pierce, Snohomish, and Spokane counties because Centene did "not have an adequate network in those four counties." Ex. 37. While Centene agreed to take steps to identify and reimburse members who had experienced improper balance billing for anesthesia in those four counties, it did so only for those who received services in 2017. *Id.* at CCH101179. It appears nothing was done for members who were improperly billed in 2015 or 2016.

On January 19, 2018, in conjunction with the OIC mandated Compliance Plan, Centene promised OIC that where "it had an identified access issue" it would take three steps to protect members from balance billing: (1) "reprocess all claims for out-of-network providers to pay claims at the provider's billed charges" and "not assign any additional cost-sharing above the in-network rate"; (2) provide

---

[3] Centene admits that it is required to protect members from balance billing when they are required to go out of network for care due to network inadequacy. *See* Ex. 30 at 75:11-14.

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 12
CASE NO. 2:18-CV-00012-SMJ

1   refunds if Centene identified "system-assigned member cost-share amounts in

2   excess of the in-network rate; and (3) reimburse members for any service charges

3   or fees incurred as a result of collections issues." Ex. 38 at 504-505. Unfortunately,

4   the "remediation plan" ultimately implemented by Centene to address these issues

5   was inadequate and required members to self-identify as having been improperly

6   billed and document their claim. *See* Exs. 39 – 41. A fraction of affected members

7   received any compensation under the remediation plan. ██████████████

8   ███████████████████████████████████████████████

9   ███████████████████ *See* Ex. 42. Defendants' data, however, shows that

10  members may be entitled to compensation for improper bills. *See* Schexnaydre

11  Decl. ¶¶ 43-47.

12      Centene continues to receive complaints about balance and surprise billing. In

13  2019, Centene reported that ████████████████████████████████

14  ██████████████████████████████████

15  ████████████████ Ex. 43 at CCH048067. ███████████████

16  █████████████████████████████████████████████

17  ████████████████████████████████████████

18  █████████████████████████████████████████

19  ██████████████████████████ Ex. 44. To this day, despite having the

20  technology to do so, Centene fails to systematically identify members who are likely

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 13
CASE NO. 2:18-CV-00012-SMJ

1    to be balance or surprise billed for services other than emergency services. *See* Ex.

2    30 at 110:23-111:12, 113:3-115:5. 116:18-117:8; *see also* Ex. 44.

3        3.    Centene fails to disclose its network inadequacies to insureds and fails
             to notify insured of their basic consumer rights.

4    The state requires Centene to accurately represent the scope of its network to

5    consumers through the Washington Health Benefit Exchange (WAHBE) Provider

6    Directory. Ex. 45 ("The directory is meant to inform consumers of the health plan's

7    network during the shopping experience."). Consumers should also be able to access

8    information about Centene's network through the "find a provider" portal on

9    Coordinated Care's website. *See* Ex. 46; *see also* Ex. 11.

10    But Ambetter members routinely complain that the website provider lists are

11    inaccurate. *See* Ex. 47 at 90:23-91:7; Ex. 30 at 250:4-19. ███████████████

12    ███████████████████████████████████

13    ███████████████████████ *See* Ex. 48. ███████████████████

14    ███████████████████████████████████

15    ███████████████████ *See* Ex. 49. ███████████████████

16    ███████████████████████████ *See id.*; *see also* Ex. 30 at 254:18-

17    255:11 (confirming that providers "have to be enrolled in our system in order to pay

18    as participating" and any delay in enrolling the providers "could result in claims from

19    those providers being denied").

20

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 14
CASE NO. 2:18-CV-00012-SMJ

Besides the inaccuracies with the Find a Provider tool, Centene fails to disclose that members have a right to an out-of-network provider if an in-network provider is not available. *See* Exs. 11 and 50. Instead, the website only tells members to call Centene if they are having trouble finding a provider or with a claim. *See* Ex. 6 at 252:13-25. Centene also fails to inform members that they should pay only the in-network amounts for shared payments if they see an out-of-network provider at an in-network facility. *See generally* Exs. 11 and 46. Instead, Centene tells the members "how to file an appeal or grievance which might result in the authorization." *See* Ex. 6 at 252:13-25.

4.    <u>Plaintiff's expert, Leslie Krier agrees that health insurers must monitor and disclose inadequacies.</u>

According to health insurance expert Leslie Krier, a health insurance company like Coordinated Care has an obligation to proactively and routinely monitor and evaluate member complaints, denials of provider claims, and claims filed by non-participating providers for "red flags" that its network is not adequate. See Declaration of Leslie Krier ("Krier Decl.") ¶ 13. If and when such "red flags" uncover improper surprise or balance billing, then the health insurer should use any and all tools at its disposal – such as Coordinated Care's Smart system or a similar algorithm – to identify and automatically pay or reimburse its members. *Id.* at 14. The health insurer should not force its members to file complaints, grievances, or

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 15
CASE NO. 2:18-CV-00012-SMJ

appeals to force reimbursement or payment of amounts they should have been protected from being charged. *Id.*

Ms. Krier also opines that a health insurer's use of Single Case Agreements to provide member care is another "red flag" of network inadequacy. *Id.* at 15. Single Case Agreements are not intended to be used often and are not a substitute for an adequate network. *Id.* Finally, Ms. Krier opines that a complete and accurate provider directory is not only required by law, but is critically important for members, potential members, and primary care providers of members to determine whether the benefits covered by the member contract are actually available in the health insurer's network at the agreed upon rates. *Id.*

**D.    Centene's inadequate provider network injured Plaintiff Harvey and other Ambetter members.**

Centene's inadequate provider network has and continues to directly affect Plaintiff Harvey. Plaintiff Harvey is a Spokane resident who bought an Ambetter policy on the Washington Health Benefit Exchange in December 2016. Plaintiff Harvey's Ambetter policy, for which she paid and continues to pay premiums, went into effect on January 1, 2017. *See* Ex. 51.

Plaintiff Harvey's problems with Ambetter commenced in the Spring 2017 when Ambetter advised her that ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████



1    Ex. 53.

2

3    Ex. 54.

4    Centene informed Ms. Harvey that

5

6

7

8    *Id.*

9        Throughout the time Plaintiff Harvey has been enrolled in Ambetter she has

10    had difficulty finding in-network providers and has identified inaccuracies with

11    Ambetter's providers. In May 2019 Ms. Harvey complained that Ambetter's

12    provider list "is constantly out of date" or inaccurate. Ms. Harvey informed the OIC

13    that she has "googled and called **HUNDREDS** of physical therapists, massage

14    therapists, behavior health specialists, and their providers list is full of doctors that

15    either don't live nearby, tho they say they do, or they wont take ambetter because

16    ambetter won't pay them, or they are not taking new patients." Ex. 55. In response,

17    Centene admitted that the accuracy of its Find a Provider tool "is dependent on the

18    information submitted to us by the providers in our network." Ex. 56. Centene

19    acknowledged that providers "do not always notify us of changes in the location or

20    status of their practice." *Id.*

1    Plaintiff Harvey is far from alone. For purposes of this motion, Plaintiff has

2    analyzed the data that Centene has produced to demonstrate to the Court that

3    potential class members can be identified from Centene's records. *See generally*

4    Schexnaydre Decl. Centene's claims data shows that ███████████████

5    ████████████████████████████████████

6    Schexnaydre Decl. ¶ 31. Centene's data also shows that ███████████

7    ████████████████ *Id.* ¶ 47. And the data shows that ██████████

8    ████████████████████████████████████ *Id.* ¶

9    43.

10    It appears, however, that certain data is missing from Centene's records.

11    Plaintiff also has requested that Centene explain certain anomalies in the data that

12    may skew the analysis. Centene promised to provide this information but, as of the

13    date this brief was filed, have not done so.

14    **III.  AUTHORITY AND ARGUMENT**

15    Plaintiffs requesting class certification must demonstrate "that they have met

16    each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least

17    one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d

18    970, 979-80 (9th Cir. 2011). While district courts must conduct a "rigorous" analysis

19    of the Rule 23 requirements, "[m]erits questions may be considered to the extent—

20    but only to the extent—that they are relevant to determining whether the Rule 23

prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)."A court, when asked to certify a class, is merely to decide a suitable method of adjudicating the case and should not 'turn class certification into a mini-trial' on the merits." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015) (quoting *Ellis*, 657 F.3d at 983 n.8).

**A.    The Rule 23(a) requirements are satisfied.**

　　　　1.    <u>Numerosity is satisfied.</u>

To satisfy numerosity, a class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While there is not a precise requirement for numerosity, it is presumed satisfied if a class consists of 40 or more members. *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1327 (N.D. Cal. 2015). Centene has produced data showing its Washington subscribers from January 11, 2012 to the present totaled more than ▮▮▮▮ members. Schexnaydre Decl. ¶ 10. Numerosity is satisfied.

　　　　2.    <u>Commonality is satisfied.</u>

Rule 23(a)(2) requires "questions of law or fact common to the class." This requirement has "'been construed permissively' and '[a]ll questions of fact and law need not be common to satisfy the rule.'" *Ellis*, 657 F.3d at 981 (alteration in original) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)); *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010) ("common" does

not mean "complete congruence"). Commonality can be satisfied by even "a single

*significant* question of law or fact." *Abdullah v. U.S. Sec. Assoc., Inc.*, 731 F.3d 952,

957 (9th Cir. 2013) (citation omitted). As the Supreme Court has explained,

"common questions must generate common *answers*" that are "apt to drive the

resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

(2011). Commonality is thus satisfied where the claims of all class members "depend

upon a common contention ... of such a nature that it is capable of classwide

resolution—which means that determination of its truth or falsity will resolve an issue

that is central to the validity of each one of the claims in one stroke." *Id.*

The central common issue presented by this case is whether Centene fails to

provide the coverage to its insureds that is required by Washington law and its

contracts. Additional common issues stem from this central common question,

including (1) whether Centene have failed to maintain an adequate provider

network; (2) whether Centene failed to accurately disclose the scope of its provider

network; (3) whether Centene failed to disclose that where there is an identified

access issue, members may not be assigned cost sharing above the in-network rate;

(4) whether Centene violated RCW 48.43.093; (5) whether Centene's conduct

constitutes an unfair or deceptive act or practice under Washington's Consumer

Protection Act; and (6) whether Coordinated Care breached its contracts with

Plaintiff and the Class.

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 20
CASE NO. 2:18-CV-00012-SMJ

1    3.   Typicality is satisfied.

2    Typicality is satisfied when "the claims or defenses of the representative

3  parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

4  "The purpose of the typicality requirement is to assure that the interest of the named

5  representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N.*

6  *Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted). "In determining

7  whether typicality is met, the focus should be on the defendants' conduct and

8  plaintiff's legal theory, not the injury caused to the plaintiff." *Lozano v. AT&T*

9  *Wireless Servs., Inc.*, 504 F.3d 718, 734 (9th Cir. 2007).

10    Plaintiff's claims are typical of class members' claims because they arise from

11  Centene's failure to maintain an adequate provider network and failure to protect

12  them from improper billing. Plaintiff and class members also share the same

13  interesting in preventing Centene from engaging in unlawful conduct in the future.

14    4.   Adequacy is satisfied.

15    The adequacy requirement is satisfied when the class representatives "fairly

16  and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To make

17  this determination, "courts must resolve two questions: '(1) do the named plaintiffs

18  and their counsel have any conflicts of interest with other class members and (2) will

19  the named plaintiffs and their counsel prosecute the action vigorously on behalf of

20  the class?'" *Ellis*, 657 F.3d at 985 (quoting *Hanlon*, 150 F.3d at 1020). With respect

1   to the adequacy of counsel, courts consider the work done to investigate the claims

2   of the proposed class, counsel's experience in handling similar cases and litigating

3   class actions, counsel's knowledge of applicable law, and the resources that counsel

4   will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(C).

5          Plaintiff and her counsel have already shown that they will vigorously pursue

6   these claims on behalf of the class. Plaintiff has assisted counsel with investigating her

7   claims and has responded to Centene's requests for production. Terrell Decl. ¶ 12.

8   Plaintiff has no conflicts with other class members because Plaintiff and class

9   members all have the same interest in avoiding improper billing practices and

10  ensuring that Centene maintains an adequate provider network and accurately

11  represent the network's scope. Plaintiff's counsel have substantial experience

12  litigating consumer protection claims and class actions, and will continue to dedicate

13  the time and resources necessary to this case. *Id.* ¶¶ 1 – 11.

14  **B.**    **The Rule 23(b)(3) requirements are satisfied.**

15         Class certification is appropriate under Rule 23(b)(3) when "questions of law

16  or fact common to the members of the class predominate over any question affecting

17  only individual members, and ... a class action is superior to other available methods

18  for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

19  Both requirements are satisfied.

20

1       1.    <u>Common issues predominate over any individual issues.</u>

2    The predominance inquiry concerns "whether proposed classes are

3 sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc.*

4 *v. Windsor,* 521 U.S. 591, 616 (1997). Predominance is satisfied when "the

5 common, aggregation-enabling issues in the case are more prevalent or important

6 than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc.*

7 *v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted). "[A] common

8 question is one where 'the same evidence will suffice for each member to make a

9 prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.*

10 (citation omitted). A plaintiff does not need to "prove that each 'element of her

11 claim is susceptible to classwide proof.'" *Amgen,* 568 U.S. at 468 (alterations

12 omitted) (citation omitted).

13    Determining whether the common questions predominate is not a matter of

14 "nose-counting"; instead, "more important questions apt to drive the resolution of

15 the litigation are given more weight in the predominance analysis over individualized

16 questions which are of considerably less significance to the claims of the class."

17 *Torres v Mercer Canyons, Inc.*, 835 F.3d 1125, 1134 (9th Cit. 2016). As a result,

18 "[w]hen common questions present a significant aspect of the case and they can be

19 resolved for all members of the class in a single adjudication, there is clear

20

1  justification for handling the dispute on a representative rather than on an individual

2  basis." *Hanlon*, 150 F.3d at 1022.

3      The predominance analysis "begins, of course, with the elements of the

4  underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton*, 563 U.S. 804,

5  809 (2011). Plaintiff asserts a CPA claim against both Defendants. The elements of a

6  CPA claim are (1) an unfair or deceptive act or practice; (2) occurring in trade or

7  commerce; (3) that impacts the public interest; (4) causes injury to the plaintiff's

8  business or property; and (5) causation. *Hangman Ridge Training Stables, Inc. v.*

9  *Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986). As discussed below, each of

10  these elements turns on predominantly common questions. Trial will focus primarily

11  on Centene's conduct and will consist of substantial common evidence. *See Durant*

12  *v. State Farm Mut. Auto. Ins. Co.*, No. 2-15-cv-01710-RAJ, 2017 WL 950588, at *5

13  (W.D. Wash. Mar. 9, 2017) (predominance satisfied where "[c]entral to each cause

14  of action is whether State Farm's use of the MMI standard to deny claims is

15  unreasonable or an 'unfair or deceptive act or practice.'").

16      *Unfair or deceptive act or practice.* The first element will turn on common

17  evidence because it is based on an objective standard. Whether particular acts are

18  unfair or deceptive under the CPA has evolved through a "gradual process of judicial

19  inclusion and exclusion." *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 785 (2013). A

20  practice is deceptive if it has "the capacity to deceive substantial portions of the

public." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 47 (2009). A practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and is not outweighed by countervailing benefits" or is "unethical, oppressive, or unscrupulous, among other things." *Klem*, 176 Wn.2d at 787 (citations omitted). Plaintiff contends that Centene engaged in unfair or deceptive practices by failing to maintain an adequate provider network and then misrepresenting its actual provider network to consumers. Ambetter members often have not been able find medical providers in their area who accept Ambetter insurance. Centene's provider roster, which is accessible from Centene's website and which is provided each month to OIC, often is inaccurate due to Centene's failure to keep up with roster changes. In addition, Centene's member contracts and other customer-facing documents fail to disclose that members are not responsible for charges by out-of-network providers over the members' cost-sharing amount where there is a network inadequacy. *See* WAC 284-170-210.

The jury will consider Centene's conduct — all of which will be proved through Centene's own records or public documents from the OIC — and will decide whether the conduct constitutes a deceptive act or practice under the CPA. And the jury also will consider whether the conduct is an "unfair" act or practice because it violates public policy. *See* RCW 48.30.040 ("No person shall knowingly make, publish, or disseminate any false, deceptive or misleading representation or

advertising in the conduct of the business of insurance, or relative to the business of insurance or relative to any person engaged therein."); *Salois v. Mutual of Omaha Ins. Co.*, 90 Wn.2d 355, 359 (1978) ("RCW 48.01.030 is a clear declaration that there is a public interest in the business of insurance and that [it] is to be conducted in good faith and free from deception."). These common issues will predominate over any individualized issues. *See Reichert v. Keefe Commissary Network, L.L.C.*, 331 F.R.D. 541, 556 (W.D. Wash. 2019) (certifying Washington CPA claim where question of whether a common practice was deceptive could be assessed on a class wide basis); *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1093 (9th Cir. 2010) (reversing district court's denial of class certification of consumer protection claim where fact finder's focus would be on whether standardized written materials were likely to mislead consumers acting reasonably under the circumstances).

*In trade or commerce.* The second element also focuses on Centene's conduct and its impact on the public generally rather than individually. Conduct occurs "in trade or commerce" when it "directly or indirectly affects the people of the state of Washington." *Panag*, 166 Wn.2d at 43. Trade or commerce is not limited to acts or practices "which are designed to induce a potential buyer to purchase goods or services." *Salois v. Mut. of Omaha Ins. Co.*, 90 Wn.2d 355, 359-60 (1978). Proof of this element will require no individualized evidence. *See Salois*,

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 26
CASE No. 2:18-CV-00012-SMJ

1    90 Wn.2d at 360 (sale of insurance and provision of "potential benefits and security

2    of coverage" are trade or commerce).

3        *Public interest impact.* The third element, proof of a public interest impact, is

4    also common to all class members. RCW 19.86.093 identifies several ways a

5    claimant may establish that an act or practice is injurious to the public interest,

6    including "by showing that the conduct injured other persons, had the capacity to

7    injure other persons, or has the capacity to injure other persons." Several factors are

8    relevant to determining whether a practice has the capacity to injure others: "(1)

9    Were the alleged acts committed in the course of defendant's business? (2) Are the

10   acts part of a pattern or generalized course of conduct? (3) Were repeated acts

11   committed prior to the act involving plaintiff? (4) Is there a real and substantial

12   potential for repetition of defendant's conduct after the act involving plaintiff? (5) If

13   the act complained of involved a single transaction, were many consumers affected

14   or likely to be affected by it?" *Rush v. Blackburn*, 190 Wn. App. 945, 968 (2015)

15   (quoting *Hangman Ridge*, 105 Wn.2d at 790). These factors focus on Centene's

16   conduct and will therefore be proven with common evidence. *See Torres v. Mercer

17   Canyons, Inc.*, 305 F.R.D. 646, 654 (E.D. Wash. 2015) (recognizing that proof of a

18   public interest impact, like proof of an unfair or deceptive act in trade or commerce,

19

20

1    is a common issue), *aff'd*, 835 F.3d 1125 (9th Cir. 2016); *see also Salois*, 90 Wn.2d

2    at 361 (sale of and provision of benefits of insurance affects the public interest).

3         *Injury to Plaintiff and class members in their property.* Class members also

4    have common injuries. The CPA "is a remedial statute that defines 'injury' liberally

5    to include when 'the plaintiff's property interest or money is diminished ... even if

6    the expenses caused by the statutory violation are minimal.'" *Torres*, 835 F.3d at

7    1135 (quoting *Panag*, 166 Wn.2d at 57). The Washington Supreme Court has

8    explained that "'[t]he injury involved need not be great,' or even quantifiable."

9    *Ambach v. French*, 167 Wn.2d 167, 171 (2009) (quoting *Hangman Ridge*, 167

10   Wn.2d at 780). Centene's records show that class members have been injured

11   because they incurred improper charges for medical care due to (1) improper claims

12   denials, (2) overcharges at out-of-network rates and/or (3) improper balance billing.

13   *See generally* Schexnaydre Decl. And even if some class members did not incur

14   improper charges, class certification is still appropriate where, as here, all class

15   members were subjected and exposed to the same unlawful conduct. *Torres*, 835

16   F.3d at 1135 (observing that "even a well-defined class may inevitably contain some

17   individuals who have suffered no harm as a result of a defendant's unlawful

18   conduct," this "merely highlights the possibility that an injurious course of conduct

19   may sometimes fail to cause injury to certain class members").

20

*Causation.* Causation is also a common issue because Plaintiff has to show only that class members would not have been injured if not for Centene's unfair or deceptive conduct. *See Schnall v. AT&T Wireless Servs., Inc.*, 171 Wn.2d 260, 278 (2011) ("A plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered injury." (citation omitted)). Plaintiff "must merely show that the 'injury complained of ... would not have happened if not for defendant's violative acts.'" *Id.* (citation omitted). Plaintiff contends that she and class members would not have paid more for medical care if Centene had maintained an adequate provider network and properly billed its insureds. Plaintiff need not prove that she and other class members individually "relied" on Centene's representations because her claim is based on omissions: Centene's failure to disclose that it was required under Washington law to protect insureds from improper balance billing when its network was inadequate. Certification in such circumstances is appropriate. *Reichert*, 331 F.R.D. at 556 (holding presumption of reliance applies where plaintiffs "primarily alleged omissions, even though the Plaintiffs allege a mix of misstatements and omissions") (citations omitted).

**Breach of contract.** Plaintiff also asserts a breach of contract claim against Coordinated Care and will use the same common evidence to prove this claim. Centene's records show that Coordinated Care uniformly promised to provide Plaintiff and other class members with access to an adequate provider network,

1   including access to accurate information about that network. Ex. 11 at 1-5. Common

2   evidence shows that Coordinated Care routinely breach those contracts, causing

3   Plaintiff and class members to incur improper charges for medical care. Because

4   Plaintiff's breach of contract claim can be established through this common

5   evidence, it should be certified.

6   **Damages.** Plaintiff need not show that class members' damages can be

7   established using common evidence. *Pulaski & Middleman, LLC v. Google*, 802

8   F.3d 979, 988 (9th Cir. 2015); *see also Meyer v. Am. Family Mut. Ins. Co.*, No.

9   3:14-CV-05305-RBL, 2015 WL 5156594, at *3 (W.D. Wash. Sept. 2, 2015)

10  ("Individual damage questions will not necessarily preclude class certification when

11  the issue of liability is common to class members."). While some courts have read

12  *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), as requiring plaintiffs to do so, the

13  Ninth Circuit explained that *Comcast* "merely stood for the proposition that

14  'plaintiffs must be able to show that their damages stemmed from the defendant's

15  actions that created the legal liability.'" *Id.* (quoting *Leyva v. Medline Indus. Inc.*,

16  716 F.3d 510, 514 (9th Cir. 2013)); *see also Nguyen v. Nissan N. Am., Inc.*, 932

17  F.3d 811, 821 (9th Cir. 2019) (finding *Comcast* satisfied where "Plaintiff has

18  demonstrated the nexus between his legal theory—that Nissan violated California law

19  by selling vehicles with a defective clutch system that was not reflected in the sale

20  price—and his damages model—the average cost of repair"). Even if class members

1    ultimately need to submit a claim form or other individualized proof to establish

2    damages, the common liability issues warrant class certification. *Tyson*, 136 S. Ct. at

3    1045 ("When 'one or more of the central issues in the action are common to the

4    class and can be said to predominate, the action may be considered proper

5    under Rule 23(b)(3) even though other important matters will have to be tried

6    separately, such as damages or some affirmative defenses peculiar to some individual

7    class members.'" (citation omitted)).

8    Plaintiff alleges that Defendants violated Washington law and Coordinated

9    Care breached its contracts with its insureds by failing to maintain an adequate

10   provider network, improperly charging Plaintiff and class members for out-of-

11   network services, and failing to protect Plaintiff and class members from balance

12   billing. Plaintiff alleges that because of these unfair or deceptive acts and practices

13   consumers incurred improper charges for health care. Because Plaintiff and class

14   members' damages stemmed from Centene's unlawful conduct, any individualized

15   damages issues do not defeat class certification.

16       2.    <u>Class certification is superior to any alternative.</u>

17   The Court should certify the class if it finds that a "class action is superior to

18   other available methods for fair and efficient adjudication of the controversy." Fed.

19   R. Civ. P. 23(b)(3). The purpose of the superiority requirement is to ensure judicial

20   economy and that a class action is the "most efficient and effective means of

1     resolving the controversy." *Wolin*, 617 F.3d at 1175 (citation omitted). Courts

2     consider four factors in evaluating the superiority requirement: "(A) the class

3     members' interests in individually controlling the prosecution or defense of separate

4     actions; (B) the extent and nature of any litigation concerning the controversy already

5     begun by or against class members; (C) the desirability or undesirability of

6     concentrating the litigation of the claims in the particular forum; and (D) the likely

7     difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). All of these factors

8     favor certification.

9        Class certification is the superior way to litigate this case. Pursuing individual

10     claims against well-defended companies like Centene would be prohibitively

11     expensive for class members. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227,

12     1234-35 (9th Cir. 1996) ("A class action is the superior method for managing

13     litigation if no realistic alternative exists."). It is also "far more efficient" to litigate

14     Plaintiff's claims "on a classwide basis rather than in thousands of individual and

15     overlapping suits." *Wolin*, 617 F.3d at 1176. Plaintiff is not aware of any individual

16     litigation filed by any class members, and this Court is well positioned to oversee the

17     continued litigation of these claims on a classwide basis given its familiarity with the

18     issues. Trial will be manageable because the central issues in the case are common to

19     all class members and both sides will use predominantly common evidence. Should

20     there be any individualized issues, the Court can use a "variety of procedural tools ...

1  to manage the administrative burdens of class litigation." *Briseno v. ConAgra Foods,*

2  *Inc.,* 844 F.3d 1121, 1128 (9th Cir. 2017).

3  **IV.  CONCLUSION**

4  Because the requirements of Rule 23(a) and (b)(3) are satisfied, Plaintiff

5  requests that the Court grant her motion for class certification, appoint her to serve

6  as class representative, and appoint Plaintiff's counsel to serve as co-lead class

7  counsel.

8  RESPECTFULLY SUBMITTED AND DATED this 20th day of January,

9  2020.

10  TERRELL MARSHALL LAW GROUP PLLC

11  By: /s/ Beth E. Terrell, WSBA #26759
12  Beth E. Terrell, WSBA #26759
    Jennifer R. Murray, WSBA #36983
13  Elizabeth A. Adams, WSBA #49175
    Attorneys for Plaintiff and the Class
14  936 North 34th Street, Suite 300
    Seattle, Washington 98103
15  Telephone: (206) 816-6603
    Facsimile: (206) 319-5450
16  Email: bterrell@terrellmarshall.com
    Email: jmurray@terrellmarshall.com
17  Email: eadams@terrellmarshall.com
    Email: hrota@terrellmarshall.com

18

19

20

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 33
CASE NO. 2:18-CV-00012-SMJ

Seth Lesser, *Admitted Pro Hac Vice*
Fran L. Rudich, *Admitted Pro Hac Vice*
Attorneys for Plaintiff and the Class
**KLAFTER OLSEN & LESSER LLP**
Two International Drive, Suite 350
Rye Brook, New York 10514
Telephone: (914) 934-9200
Email: seth@klafterolsen.com
Email: fran@klafterolsen.com
Email: nancy.velasquez@klafterolsen.com
Email: alexis.castillo@klafterolsen.com
Kurt B. Olsen
Attorneys for Plaintiff and the Class
**KLAFTER OLSEN & LESSER LLP**
1250 Connecticut Avenue, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 261-3553
Email: ko@klafterolsen.com

Robert S. Green, *Admitted Pro Hac Vice*
James Robert Noblin, *Admitted Pro Hac Vice*
Attorneys for Plaintiff and the Class
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, California 94939
Telephone: (415) 477-6700
Email: gnecf@classcounsel.com
Email: jrn@classcounsel.com

David Martin
Mark Ravis, *Admitted Pro Hac Vice*
Attorneys for Plaintiff and the Class
**MARK RAVIS & ASSOCIATES**
1875 Century Park East, Suite 700
Los Angeles, California 90067
Telephone: (310) 295-4145
Email: dhmartin99@gmail.com
Email: mravis99@gmail.com

*Attorneys for Plaintiff and Proposed Class*

1

### CERTIFICATE OF SERVICE

2

I, Beth E. Terrell, hereby certify that on January 20, 2020, I electronically

3

filed the foregoing with the Clerk of the Court using the CM/ECF system which will

4

send notification of such filing to the following:

5

6       Maren Roxanne Norton, WSBA #35435
        J. Scott Pritchard, WSBA #50761
        Attorneys for Defendants
7       **STOEL RIVES LLP**
        600 University Street, Suite 3600
8       Seattle, Washington 98101
        Telephone: (206) 624-0900
9       Facsimile: (206) 386-7500
        Email: mrnorton@stoel.com
10      Email: scott.pritchard@stoel.com

11      Steven M. Cady, *Admitted Pro Hac Vice*
        Brendan V. Sullivan, Jr., *Admitted Pro Hac Vice*
12      Andrew McBride
        William Murray
13      Attorneys for Defendants
        **WILLIAMS & CONNOLLY, PLLC**
14      725 Twelfth Street, N.W.
        Washington, D.C. 20005
15      Telephone: (202) 434-5321
        Facsimile: (202) 434-5029
16      Email: scady@wc.com
        Email: bsullivan@wc.com
17      Email: amcbride@wc.com
        Email: bmurray@wc.com

18

19

20

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 35
CASE NO. 2:18-CV-00012-SMJ

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

DATED this 20th day of January, 2020.

TERRELL MARSHALL LAW GROUP PLLC

By:    /s/ Beth E. Terrell, WSBA #26759
  Beth E. Terrell, WSBA #26759
  Attorneys for Plaintiff and the Class
  936 North 34th Street, Suite 300
  Seattle, Washington 98103
  Telephone: (206) 816-6603
  Facsimile: (206) 319-5450
  Email: bterrell@terrellmarshall.com