1    Brendan V. Sullivan, Jr.                    Honorable Salvador Mendoza, Jr.
     Steven M. Cady
2    WILLIAMS & CONNOLLY LLP
     725 Twelfth Street, N.W.
3    Washington, D.C. 20005
     Tel.: 202-434-5321
4    scady@wc.com

5    Maren R. Norton
     STOEL RIVES LLP
6    600 University Street, Suite 3600
     Seattle, WA  98101
7    Tel.: 206-624-0900
     maren.norton@stoel.com
8
     *Attorneys for Defendants*
9

10                  UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF WASHINGTON
11                         AT YAKIMA

12   CYNTHIA HARVEY, individually      No. 2:18-CV-00012-SMJ
     and on behalf of all others similarly
     situated,                         **DEFENDANTS' OPPOSITION
13                                      TO PLAINTIFF'S MOTION FOR
                                        CLASS CERTIFICATION**
14                  Plaintiff,
                                         Oral argument:
15           v.
                                        April 14, 2020 at 9:00 a.m. in
16   COORDINATED CARE                   Spokane
     CORPORATION and CENTENE
17   MANAGEMENT COMPANY, LLC,

18                  Defendants.

19

1

# **TABLE OF CONTENTS**

2    PRELIMINARY STATEMENT ..................................................................1

3    BACKGROUND ......................................................................................3

4     A. Network adequacy ..........................................................3

 B. The relevant insurance policy provision ..............................4

5     C. The OIC's consent order and remediation plan ....................4

6     D. Specific allegations........................................................7

LEGAL STANDARD ...............................................................................8

7    THIS CASE SHOULD NOT BE EXPANDED INTO A CLASS
ACTION ...............................................................................................9

8

9    I. No Superiority:  A Class Action Is Not Superior to Existing,
Effective Methods of Recouping Out-of-Network Costs.............................9

10    A. A class action is not superior to contacting Coordinated
Care.........................................................................................10

11    B. A class action is not superior to contacting the OIC..........12

12    C. A class action is not superior to the remediation plan ordered
by the OIC. ...............................................................................14

13   II. No Predominance:  Common Issues Do Not Predominate over
Highly Individual Issues Regarding Reimbursement for Out-of-
14   Network Costs. ....................................................................................18

15    A. The question of injury is individualized............................21

 B. The question of causation is individualized. .......................25

16    C. The question of damages is individualized. .......................30

17   CONCLUSION......................................................................................33

18

19

1

## <u>TABLE OF AUTHORITIES</u>

2

### FEDERAL CASES

3   *Amchem Products, Inc. v. Windsor*, 521 US 591 (1997) ..........................................19

4   *Andrews v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 889 (9th Cir.
      2019) ....................................................................................................22

5   *Blough v. Shea Homes, Inc.*, 2014 WL 3694231 (W.D. Wash. July 23,
      2014) ....................................................................................................30
6

7   *Campion v. Old Republic Home Prot. Co.*, 272 F.R.D. 517 (S.D. Cal.
      2011) ....................................................................................................28

8   *Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998) .........................................13

9   *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ......................................19, 30, 31

10   *Conde v. Sensa*, 2018 WL 4297056 (S.D. Cal. Sept. 10, 2018) ..............................17

    *Daniel F. v. Blue Shield of Calif.*, 305 F.R.D. 115 (N.D. Cal. 2014) .....................31
11
    *Flores v. Supervalu, Inc.*, 509 F. App'x 593 (9th Cir. 2013) ..................................31
12
    *Geier v. M-Qube Inc.*, 314 F.R.D. 692 (W.D. Wash. 2016) ...................................29
13
    *Grundmeyer v. Allstate Property & Casualty Ins. Co.*, 2015 WL
14     9487928 (W.D. Wash. Sept. 29, 2015) ..................................................14

15   *Imber-Gluck v. Google Inc.*, 2015 WL 1522076 (N.D. Cal. Apr. 3,
      2015) ............................................................................................16, 17

16   *In re First Am. Home Buyers Prot. Corp. Class Action Litig.*, 313
      F.R.D. 578 (S.D. Cal. 2016) .................................................................26
17
    *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D.
18     332 (D.N.J.1997) ..................................................................................13

    *In re Hotel Telephone Charges*, 500 F.2d 86 (9th Cir. 1974) ..................................11
19

1    *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 214 F.R.D. 614
(W.D. Wash. 2003) ........................................................................17

2

3    *Johnson v. Harley-Davidson Motor Co. Group, LLC*, 285 F.R.D. 573
(E.D. Cal 2012) ............................................................................13

4    *Kamm v. California City Development, Co.*, 509 F.2d 205 (9th Cir.
1975) ...............................................................................12, 15, 16

5    *Kelley v. Microsoft Corp.*, 2011 WL 13353905 (W.D. Wash. May 24,
2011) ............................................................................................29

6

*Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017)...................30

7    *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950 (S.D. Cal. 2016) ........................22, 23, 25

8    *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ..........................8, 29

9    *Murray v. DirecTV, Inc.*, 2014 WL 12597904 (C.D. Cal. Apr. 23,
2014) ............................................................................................17

10

*Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811 (9th Cir. 2019) ....................26, 30, 31

11

*O'Dell v. Conseco Senior Health Ins. Co.*, 2011 WL 13044240 (W.D.

12    Wash. Feb. 10, 2011) ...................................................................27, 29

13    *Pattillo v. Schlesinger*, 625 F.2d 262 (9th Cir. 1980)......................................11, 18

*Poulos v. Caesars World, Inc.*, 379 F.3d 654 (9th Cir. 2004) ............................27

14

*Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir.

15    2015) ............................................................................................31

16    *Rowden v. Pacific Parking Systems, Inc.*, 282 F.R.D. 581 (C.D. Cal.
2012) ........................................................................................12, 13

17    *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668 (9th Cir. 1975)..................9

18    *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016).......................22, 23

19    *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) .....................................19

1   *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)............................9

2   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).........................................8, 19

3   *Webb v. Carter's Inc.*, 272 F.R.D. 489 (C.D. Cal. 2011) .......................................17

    *Zinser v. Accufix Res. Inst.*, 253 F.3d 1180 (9th Cir. 2001) .....................................9
4

## STATE CASES

*DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 317 P.3d 543
    (Wash. Ct. App. 2014) .......................................................................................21

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719
    P.2d 531 (Wash. 1986) (en banc) ......................................................................20

*Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 170
    P.3d 10 (Wash. 2007) (en banc) ...................................................................25, 28

*Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 899 P.2d 6 (Wash
    Ct. App. 1995).................................................................................................25

## STATUTES, RULES. AND REGULATIONS

Federal Rule of Civil Procedure 23(b)(3) .....................................................9, 10, 18

WAC 284-43B-010 ...........................................................................................6

WAC 284-170-200(13)(b)(ii) ...........................................................................3

WAC 284-170-200(15) ......................................................................................3

WAC 284-170-210.............................................................................................3

## OTHER AUTHORITIES

7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and
    Procedure (3d ed. 2008)................................................................................9, 10

1          **<u>PRELIMINARY STATEMENT</u>**

2          Coordinated Care's members see out-of-network doctors for a variety of

3    reasons.  When a member contacts Coordinated Care or the Office of the Insurance

4    Commissioner to request reimbursement for out-of-network costs, Coordinated

5    Care's member-service team analyzes the request.  This happens on a regular basis.

6    For each request, they look into the reason that care was sought from an out-of-

7    network provider, the availability of an in-network provider, the amount of any

8    applicable deductible, and more.  This work is necessary to resolve each individual

9    request because in some circumstances, the member is entitled to reimbursement;

10   in others, the member is not—pursuant to the terms of the insurance policy, which

11   describes how out-of-network costs are handled.  Requests often involve sensitive

12   medical issues, and significant work goes into resolving each one.

13         Plaintiffs ask this Court to take on this complex task on a class-wide basis.

14   The Court should decline for two reasons:

15         *First*, there are existing ***superior methods*** for addressing costs that

16   Coordinated Care's members incur by seeing an out-of-network doctor.  These

17   superior methods include (a) contacting Coordinated Care to seek reimbursement,

18   with an ultimate right to adjudication by an Independent Review Organization; (b)

19   contacting the Office of the Insurance Commissioner for assistance; and (c)

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 1
Case No. 2:18-CV-00012-SMJ

1    participating in a remediation program ordered and approved by the Insurance

2    Commissioner to address these costs.  Plaintiff herself has successfully used two of

3    these methods.  These methods are effective—so much so that it is unlikely any

4    significant number of members have unaddressed costs.  Because expanding this

5    case into a class action is not a superior way to address out-of-network costs as

6    compared to existing and effective methods, this case fails Rule 23's superiority

7    requirement.

8         *Second*, each time a member requests reimbursement for out-of-network

9    costs, a ***highly individualized inquiry*** is required to address the request.

10    Individualized issues predominate over any common issues, making these

11    reimbursement requests impossible to address on a class-wide basis.  If a class

12    were certified, this Court would be required to delve into the unique facts of each

13    individual request to address each request pursuant to the terms of the insurance

14    policy.  Moreover, as Plaintiff concedes, the issue of any damages is highly

15    individualized.  Because unique facts predominate each individual request, this

16    case fails Rule 23's predominance requirement.

17         When a member incurs cost from an out-of-network provider, the member is

18    able to utilize existing and effective methods to address that cost.  These methods

19    are approved by the Office of the Insurance Commissioner.  They make more

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 2
Case No. 2:18-CV-00012-SMJ

1    sense than litigating individual requests as a class action, and they avoid injecting

2    more inefficiencies and litigation into the health care system.  If Plaintiff still has

3    unaddressed costs from out-of-network care, Coordinated Care would like to

4    address those costs.

5                                    **BACKGROUND**

6         **A.    Network adequacy**

7         Washington requires that health insurers maintain an adequate network of

8    healthcare providers.  Specifically, the Office of the Insurance Commissioner

9    ("OIC") requires that 80% of an insurer's members be within certain distances of

10   in-network primary care providers and providers with various specialties, or the

11   insurer must file an Alternative Access Delivery Request with the Insurance

12   Commissioner to describe its plan to cover its members and reach in-network

13   adequacy.  *See* WAC 284-170-200(13)(b)(ii), (15); WAC 284-170-210; and Wendt

14   Decl. ¶ 4.  It is common (and permitted) in the health insurance industry to have

15   networks that do not cover all members in all areas for all specialties.  This

16   happens for many reasons, including: (i) shortages of doctors in rural areas or

17   specialized fields; and (ii) doctors or other providers choosing to stay out of

18   network in order to negotiate higher fees.  *See* Wendt Decl. ¶ 5.

19

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 3
Case No. 2:18-CV-00012-SMJ

1        **B.        The relevant insurance policy provision**

2        The insurance policy at issue contemplates that a nearby in-network provider

3    will not always be available, and it directs members to contact Coordinated Care in

4    those circumstances.  Wendt Decl., Ex. 1 at 12, 59, 71 (insurance policy).  The

5    policy states that Coordinated Care will cover costs incurred by members who see

6    an out-of-network provider because no in-network provider is available.  *See id.* at

7    59.  This occurs from time to time, and Coordinated Care works to reimburse these

8    costs in response to requests from members, contact from the OIC, or a response

9    from a member to the remediation letters described below.  *See* Wendt Decl. ¶ 8.

10        **C.        The OIC's consent order and remediation plan**

11        In response to complaints similar to those raised by Plaintiff, the Office of

12    the Insurance Commissioner conducted an investigation of Coordinated Care in

13    2017 and identified areas of inadequate in-network coverage, predominantly

14    focused on anesthesiologists and emergency room providers in certain counties.  In

15    December 2017, the OIC entered into a consent order and remediation plan with

16    Coordinated Care.  *See* Wendt Decl., Ex. 2.

17        The OIC required Coordinated Care to (i) expand its network for certain

18    types of providers in certain areas, and (ii) proactively contact its members to make

19    them whole for costs they incurred by seeing an out-of-network provider when no

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 4
Case No. 2:18-CV-00012-SMJ

1  in-network provider was available.  Wendt Decl., Ex. 2 at 1 & 4; Wendt Decl. ¶ 9.

2  The OIC further required Coordinated Care to hire an external auditor, who

3  reported to OIC, to oversee implementation of the remediation plan.  Wendt Decl.,

4  Ex. 2 at 1.

5          Pursuant to the remediation plan, in April 2018 Coordinated Care sent letters

6  to more than 73,000 of its members, including everyone who was a member in

7  2016 and 2017.  The letter offered to resolve out-of-network costs that members

8  incurred when no in-network provider was available.  Wendt Decl. ¶ 11–13.  The

9  letter addressed two types of out-of-network costs: (1) where a member visits an

10  out-of-network provider because no in-network provider was available, and (2)

11  where a member visits an in-network facility but was billed for treatment by an

12  out-of-network provider at the facility.  *See* Wendt Decl. ¶ 12.  The remediation

13  letter was approved by the OIC, and it directed members to contact either

14  Coordinated Care or the OIC to seek reimbursement.  *See* Wendt Decl., Ex. 3

15  (remediation letter).

16          In addition, the external auditor overseeing the remediation plan sent a

17  second remediation letter in June 2018 to more than 11,000 Coordinated Care

18  members.  The auditor selected those 11,000 Coordinated Care members for a

19  follow-up letter based on their claims history.  The auditor's letter similarly sought

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 5
Case No. 2:18-CV-00012-SMJ

1    to resolve out-of-network cost issues.  *See* Wendt Decl., Ex. 4 (auditor letter);

2    Wendt Decl. ¶ 15.

3        Several hundred members responded to the remediation letters—either

4    directly to Coordinated Care, to the OIC, or to the auditor—and Coordinated Care

5    addressed each of these responses under the oversight of the OIC and the external

6    auditor.  Wendt Decl. ¶ 16.

7        The OIC informed Coordinated Care in January 2019 that Coordinated Care

8    had successfully completed the steps required by the remediation plan.  Wendt

9    Decl., Ex. 5 (letter from OIC).  Pursuant to the insurance policy, Coordinated Care

10   continues to resolve costs that members incur by seeing an out-of-network provider

11   when no in-network provider is available, including when contacted by a member,

12   contacted by the OIC, or when a member responds to the remediation letters.

13   Wendt Decl. ¶ 19.[1]

14

15

16

17   _____

     [1]  On January 1, 2020, new legislation went into effect that prohibits out-of-
18   network providers from billing patients who seek treatment from in-network
     hospitals.  This legislation reduces the likelihood that certain of the out-of-network
19   costs complained about by Plaintiff will occur in the future.  Wendt Decl. ¶ 21–23;
     *see also* WAC 284-43B-010.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 6
Case No. 2:18-CV-00012-SMJ

1    **D.    Specific allegations**

2         Plaintiff alleges that she incurred costs for out-of-network care because no

3    in-network providers were available.  Third Amended Complaint (TAC) ¶¶ 54, 54.

4    She admits that Coordinated Care resolved many of these costs when she contacted

5    Coordinated Care or the OIC, but she alleges that some remain unresolved.  TAC

6    ¶ 56; Mot. 1–2.  Coordinated Care is unaware of any unresolved out-of-network

7    costs incurred by Plaintiff.  Wendt Decl. ¶ 27.   Plaintiff points to Exhibit 54 of her

8    motion to suggest that she has unresolved out-of-network costs, Mot. at 16–17, but

9    the out-of-network costs identified in Exhibit 54 have been resolved consistent

10   with the terms of her insurance policy and the consent order entered into between

11   the Office of the Insurance Commissioner and Coordinated Care.  Wendt Decl. ¶

12   28.

13        Plaintiff's motion suggests that Coordinated Care did not cover kidney

14   dialysis for its members because it had no dialysis centers in its network.  Mot. at

15   9.  That is not accurate.  Before Coordinated Care had dialysis centers in its

16   network, Coordinated Care covered dialysis treatment for its members by entering

17   into a "Single Case Agreement" with a dialysis provider for each member who

18   needed dialysis treatment, or it would simply pay the dialysis center directly for the

19   treatment.  Wendt Decl. ¶ 25.  Either way, Coordinated Care would cover the

1    treatment and the member would not have out-of-network costs. *Id.* To

2    Coordinated Care's knowledge, no member has outstanding out-of-pocket costs

3    associated with receiving out-of-network dialysis treatment. *Id.* ¶ 26.

4    <u>**LEGAL STANDARD**</u>

5         Plaintiff bears the burden of demonstrating that this case meets the

6    requirements of Federal Rule of Civil Procedure 23 and should be expanded into a

7    class action. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Rule 23

8    does not set forth a mere pleading standard." *Id.* "A party seeking class

9    certification must . . . be prepared to prove" that the Rule's requirements are "*in*

10   *fact*" met. *Id.* For its part, "[b]efore certifying a class, the trial court must conduct

11   a 'rigorous analysis' to determine whether the party seeking certification has met

12   the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588

13   (9th Cir. 2012) (quoting *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th

14   Cir. 2001)). Plaintiff fails to clear this high bar because two essential elements of

15   Rule 23 are not met: superiority and predominance.

16

17

18

19

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 8
Case No. 2:18-CV-00012-SMJ

1    <u>**THIS CASE SHOULD NOT BE EXPANDED INTO A CLASS ACTION**</u>

2    **I.    <u>No Superiority</u>:  A Class Action Is Not Superior to Existing, Effective**

3    **Methods of Recouping Out-of-Network Costs.**

4    Rule 23(b)(3) permits certification only where "a class action is superior to

5    other available methods for fairly and efficiently adjudicating the controversy."

6    Fed. R. Civ. P. 23(b)(3).  The superiority requirement serves to weed out cases

7    unless they "can be adjudicated most profitably on a representative basis." *Zinser*,

8    253 F.3d at 1190.  To that end, a court must consider "what other procedures, if

9    any, exist for disposing of the dispute before it."  7AA Charles Alan Wright &

10    Arthur R. Miller, Federal Practice and Procedure § 1779 (3d ed. 2008).  The court

11    "must compare the possible alternatives to determine whether [a class action] is

12    sufficiently effective to justify the expenditure of the judicial time and energy that

13    is necessary to adjudicate a class action." *Id.*

14    "A class action is the superior method for managing litigation *if no realistic*

15    *alternative exists*." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th

16    Cir. 1996) (emphasis added); *accord Rutledge v. Elec. Hose & Rubber Co.*, 511

17    F.2d 668, 673 (9th Cir. 1975) (noting that the superiority requirement demands that

18    a class action be "superior to, *and not just as good as*, other available methods")

19    (emphasis added).

1          The superiority analysis is not limited to comparing class actions to other

2     forms of litigation such as individual lawsuits.  The text of Rule 23(b)(3) refers

3     broadly to "other available methods for fairly and efficiently adjudicating the

4     controversy."  Fed. R. Civ. P. 23(b)(3).  The Rule's drafters recognized that

5     "another method of handling the litigious situation may [have] greater practical

6     advantages" than a class action.  Fed. R. Civ. P. 23(b)(3) Advisory Committee

7     Note.  Accordingly, they chose language, including the expansive term "methods,"

8     that extends beyond judicial mechanisms.  *See* Wright & Miller, *supra*, § 1779

9     ("The court need not confine itself to other available 'judicial' methods of handling

10    the controversy in deciding the superiority of the class action.").

11         In this case, there are three effective alternative means for Coordinated Care

12    members to recoup improperly incurred out-of-network costs.  These methods are:

13    (a) contacting Coordinated Care, (b) contacting the OIC, and (c) participating in

14    the OIC-approved remediation plan that addresses the costs raised by Plaintiff.

15         **A.     A class action is not superior to contacting Coordinated Care.**

16         The insurance policy at issue directs members to contact Coordinated Care if

17    they have a problem, such as incurring costs from an out-of-network provider

18    when no in-network provider is available.  Wendt Decl., Ex. 1 at 74-75, 82

19    (insurance policy).  The procedure in the insurance policy is straightforward.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 10
Case No. 2:18-CV-00012-SMJ

1    Members can call or write to Coordinated Care to seek reimbursement.  *See id.* at

2    74–78.  Coordinated Care will work to resolve the issue by analyzing the unique

3    facts of each request.  *Id.* at 74.  If the member is not satisfied with Coordinated

4    Care's resolution, the member can escalate the issue to be adjudicated by an

5    outside Independent Review Organization certified by the OIC.  *Id.* at 75–78.  The

6    outside IRO's decision is binding on Coordinated Care.  *Id.* at 78.  This process has

7    worked many times, and it leads to relatively efficient resolutions of out-of-

8    network costs in nearly every instance in which a member has used it.  *See* Wendt

9    Decl. ¶ 29.  In fact, prior to filing suit, Plaintiff herself had already successfully

10   used the process.  *See* TAC ¶ 56.

11          A class action offers no advantage over this process, which is approved by

12   the OIC and allows for escalation to an Independent Review Organization if

13   requested by the member.  Indeed, a class action is inferior to the existing process

14   because "any claims paid through the class action procedures would be reduced by

15   the costs of suit and attorneys' fees."  *Pattillo v. Schlesinger*, 625 F.2d 262, 265

16   (9th Cir. 1980); *see also In re Hotel Tel. Charges*, 500 F.2d 86, 91 (9th Cir. 1974)

17   ("Whenever the principal, if not the only, beneficiaries to the class action are to be

18   the attorneys for the plaintiffs and not the individual class members, a costly and

19

1    time-consuming class action is hardly the superior method for resolving the

2    dispute.").

3        **B.    A class action is not superior to contacting the OIC.**

4        A member can also contact the Office of the Insurance Commissioner if the

5    member incurs costs from seeing an out-of-network provider when no in-network

6    provider is available.  When a member contacts the OIC, it will work to get the

7    member's costs recouped, where appropriate.  *See What we can (and can't do)*,

8    https://www.insurance.wa.gov/what-we-can-and-cant-do (last visited Feb. 19,

9    2020).  In 2019, the OIC processed over 6,000 requests from consumers and

10    recovered almost $14 million.  *Contacting us gets results*,

11    https://www.insurance.wa.gov/contacting-us-gets-results (last visited Feb. 19,

12    2020).

13        Courts routinely find that processes like the OIC's are superior to class

14    actions.  The Ninth Circuit has long held that "administrative methods of settling

15    the dispute" are relevant to determining whether "the class action is the most

16    efficient and effective means of settling the controversy."  *Kamm v. Cal. City Dev.,*

17    *Co.*, 509 F.2d 205, 211 (9th Cir. 1975).  For example, in *Rowden v. Pac. Parking*

18    *Sys.*, plaintiffs sued the city of Laguna Beach for printing parking receipts that

19    displayed the expiration date of the driver's credit card in violation of federal law.

1    282 F.R.D. 581 (C.D. Cal. 2012).  The court recognized that California law allows

2    consumers to file administrative claims against the municipality and requires the

3    public entity to investigate and settle claims "without the expense of litigation."

4    *Id.* at 586 (internal quotation marks omitted).  When compared to this

5    "administrative claims process capable of expeditiously processing [Plaintiff's]

6    claims," the court found that a class action could not be the superior method.  *Id.* at

7    587.

8         Similarly, the Eastern District of California rejected a class action that

9    sought to litigate an alleged motorcycle defect on a class basis.  The court held that

10   a class action was not superior to the National Highway Traffic Safety

11   Administration's program that could investigate the defect and order the

12   manufacturer to recall the vehicles for repair.  *Johnson v. Harley-Davidson Motor*

13   *Co.*, 285 F.R.D. 573, 584 (E.D. Cal. 2012).  The court determined that it could

14   provide no better relief by certifying a class.  *Id.  See also Chin v. Chrysler Corp.*,

15   182 F.R.D. 448, 464-65 (D.N.J. 1998) (finding that the administrative remedy is

16   better than a class action); *In re Ford Motor Co. Ignition Switch Prods. Liab.*

17   *Litig.,* 174 F.R.D. 332, 353 (D.N.J. 1997) (same).

18        The same logic applies here.  The OIC's process is intended to help insureds

19   with precisely the concerns at hand.  The regulator's role saves the member time

1    and legal fees, and it focuses on the unique facts of each individual request for

2    reimbursement.[2]  Those advantages were presumably clear to Plaintiff, who

3    successfully used the administrative process before pursuing litigation.[3]  TAC ¶ 56.

4         **C.    A class action is not superior to the remediation plan ordered by**

5             **the OIC.**

6             In addition to contacting Coordinated Care or the OIC, a member also can

7    participate in the OIC-ordered remediation plan described above.  That plan

8    includes a process for members to be reimbursed for costs that they incurred from

9    an out-of-network provider because no in-network provider was available (i.e.,

10   "balance billing") or when a member received care from an out-of-network

11   provider at an in-network facility (i.e., "surprise billing").  At the OIC's direction,

12   Coordinated Care sent letters to more than 73,000 of its members inviting

13   participation in the remediation plan.  Wendt Decl. ¶ 11 & Ex. 3 to Wendt Decl.

14

15   _____

16   [2]  The many unique and often personal facts particular to each request also create
     significant "difficulties in managing a class action," one of the key factors
     weighing against superiority.  Fed. R. Civ. P. 23(b)(3); *see Grundmeyer v. Allstate*

17   *Prop. & Cas. Ins.*, 2015 WL 9487928, at *3 (W.D. Wash. Sept. 29, 2015).

18   [3]  An insured can simultaneously work with an insurance company and the OIC to
     seek reimbursement for out-of-network costs.  *How to appeal a health insurance*

19   *denial*, Washington OIC, https://www.insurance.wa.gov/how-appeal-health-
     insurance-denial (last visited Feb. 19, 2020).

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 14
Case No. 2:18-CV-00012-SMJ

1    The external auditor sent a follow-up letter to more than 11,000 of Coordinated

2    Care's members.  Wendt Decl. ¶ 15 & Ex. 4 to Wendt Decl.  Coordinated Care's

3    members responded to the remediation letters, and Coordinated Care issued

4    reimbursements where appropriate.[4]  Coordinated Care paid its members interest—

5    at 8%—in connection with the reimbursement of these costs.  Wendt. Decl., Ex. 2

6    at 4.  This process was approved and overseen by the external auditor, in

7    coordination with the OIC.  Wendt Decl. ¶¶ 14, 16, 18.  Coordinated Care will

8    continue to address any further responses that it receives to these letters.  *Id.* ¶ 19.

9        In instances where a remedy like this already is in place, courts routinely

10   find that a subsequent class action fails to meet the superiority requirement.  Courts

11   have been especially reluctant to duplicate an agency's efforts.  In a seminal case

12   on administrative remedies in the context of superiority, *Kamm v. California City*

13   *Development Co.*, the Ninth Circuit considered a putative class action brought

14   against real estate companies for a fraudulent land-promotion scheme.  509 F.2d

15

16   _____

17   [4]  Although Plaintiff complains that the remediation plan required affected
     members to "self-identify" (Mot. at 13), the remediation letter sent by Coordinated
     Care is very similar to the notice that would be given to class members should

18   Plaintiff prevail on class certification.  *See Imber-Gluck v. Google Inc.*, 2015 WL
     1522076, at *3–4 (N.D. Cal. Apr. 3, 2015) ("[I]t is unlikely that a class notice and
     claims process achieved through this litigation would be much different than that

19   under the FTC settlement.").

1    205.  Before plaintiffs brought suit, the state's Attorney General and Real Estate

2    Commissioner had sued the defendants.  *Id.* at 207.  The AG's action led to a

3    settlement agreement that required defendants to pay restitution and establish a

4    program to settle any remaining disputes.  *Id.* at 208.

5        The court found that a class action was not superior to the AG's action and

6    resulting remedies.  It stressed several factors in the superiority analysis, including

7    that: (1) "[a] class action would require a substantial expenditure of judicial time

8    which would largely duplicate and possibly to some level negate the work on the

9    state level"; (2) "[s]ignificant relief had been realized in the state action" through

10   the settlement agreement and restitution payments; (3) the class action would

11   include numerous members involved in separate transactions over a long period;

12   and (4) the class action would be costly and duplicate work expended in the state

13   action.  *Id.* at 212.  At bottom, the court rejected the class action because the AG

14   action and a class action "involve the same fraudulent conduct of the defendants

15   and both seek to provide relief for those injured thereby."  *Id.* at 213.

16       The court's reasoning in *Kamm* compels the same result here.  All the

17   factors weigh against a finding of superiority.  In comparing the existing remedies

18   and a class action, this case is even more clear-cut than *Kamm*: both methods

19   would address the same issues, involve the same members and insurer, and provide

1    the same relief.  *See Murray v. DirecTV, Inc.*, 2014 WL 12597904, at *3–4 (C.D.

2    Cal. Apr. 23, 2014) (finding lack of superiority where both the administrative

3    remedy and the class action lawsuit target the same statutory violation and provide

4    relief to the same consumers).  It makes little sense for this Court to retread the

5    exact same ground that the OIC and Coordinated Care have previously covered.

6    *See, e.g.*, *Conde v. Sensa*, 2018 WL 4297056, at *14–16 (S.D. Cal. Sept. 10, 2018)

7    (applying *Kamm* to deny class certification based on prior FTC settlement that

8    covers the same issues and relief as the putative class action); *Imber-Gluck*, 2015

9    WL 1522076, at *3–4 (reaching the same conclusion and noting that the "FTC

10    investigation was based on the same underlying conduct as the instant litigation,

11    [and] the FTC settlement provides complete refunds to the class members").

12        A class action is particularly inappropriate in a case like this where there is

13    an existing reimbursement program.  *See, e.g.*, *In re Phenylpropanolamine (PPA)*

14    *Prods. Liab. Litig.*, 214 F.R.D. 614, 622–23 (W.D. Wash. 2003) (finding that, in

15    light of defendants' refund and product replacement programs, the class

16    mechanism was "unnecessary to afford the class members redress"); *Webb v.*

17    *Carter's Inc.*, 272 F.R.D. 489, 505 (C.D. Cal. 2011) (concluding that "a class

18    action is not superior because [defendant] is already offering the very relief that

19    Plaintiffs seek").  Here, Coordinated Care and the OIC give members a low-cost,

1    simple way to secure reimbursement for out-of-network costs where appropriate,

2    with interest.  There is no chance that a class action would be more efficient or less

3    costly.  *See Pattillo*, 625 F.2d at 265 (finding that "a class action procedure is not

4    superior to the ongoing administrative proceedings for the notification and

5    payment" of members of the proposed class).

6        This is an unusual case where three overlapping mechanisms exist to address

7    the out-of-network costs that Plaintiff asks this court to adjudicate.  The usual

8    rationale for class actions—that plaintiffs lack resources or sufficient incentive to

9    pursue individual claims—does not apply here, where Coordinated Care's

10   members have multiple low-cost methods to receive reimbursement and an

11   Insurance Commissioner to advocate (and regulate) for their interests.  Because a

12   class action is not superior to these alternative methods, class certification should

13   be denied.

14   **II.    No Predominance:  Common Issues Do Not Predominate over Highly**

15         **Individual Issues Regarding Reimbursement for Out-of-Network Costs.**

16       Rule 23(b)(3) permits certification only where a plaintiff can show "that the

17   questions of law or fact common to class members predominate over any questions

18   affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Courts must give

19   "careful scrutiny to the relation between common and individual questions," and

1    may not certify a class unless the "common, aggregation-enabling, issues in the

2    case are more prevalent or important than the non-common, aggregation-defeating,

3    individual issues." *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)

4    (citation omitted).  This test is "far more demanding" than Rule 23(a)(2)'s

5    commonality requirement, *Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997),

6    which itself is not satisfied by just *any* common question, but only by a question

7    the resolution of which "will resolve an issue that is central to the validity of each

8    one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

9    350 (2011).  A single individualized element can defeat predominance:  for

10    example, if there is no method of measuring damages on a classwide basis,

11    "[q]uestions of individual damage calculations will inevitably overwhelm

12    questions common to the class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34

13    (2013).

14         Plaintiff asserts two causes of action: unfair practices in violation of the

15    Washington Consumer Protection Act ("CPA") and breach of contract.  These

16    causes of action are the vehicle for her two theories of liability:  that Coordinated

17    Care (1) maintained an inadequate provider network and (2) misrepresented the

18    scope of its provider network by maintaining an inaccurate provider directory,

19

1    thereby causing some class members to incur out-of-network costs.[5] *See* Mot. 25,

2    28, 29–31.

3           Plaintiff proposes a class of every person who purchased an Ambetter

4    insurance policy from Coordinated Care in Washington.  Unsurprisingly, Plaintiff

5    offers no model for adjudicating the unique facts of each request for out-of-

6    network costs on a class-wide basis.  If the Court were to certify the class that

7    Plaintiff proposes, it would have to hold a mini-trial for every class member to

8    determine whether the member was charged an out-of-network cost, the reason that

9    care was sought from an out-of-network provider, the availability of an in-network

10   provider at the relevant time and for the relevant specialty, whether the member

11   paid some or all of the out-of-network cost, the amount of any applicable

12   deductible, whether Coordinated Care already remediated the cost, and the

13   appropriate reimbursement amount.  This work would be necessary to address each

14   unique request because in some circumstances, the member is entitled to

15   reimbursement; in others, the member is not.  For this reason, Rule 23(b)(3)'s

16   predominance requirement is not satisfied.

17

18   _____

19   [5]  Plaintiff's class certification motion cites various statutory and regulatory
      provisions, *e.g.*, Mot. 20, 25–26, but all are tied to those two fundamental theories.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 20
Case No. 2:18-CV-00012-SMJ

1    **A.    The question of injury is individualized.**

2    To prevail on a claim under the Consumer Protection Act or for breach of

3    contract, a class member must prove actual injury.  A CPA injury "need not be

4    great, but it must be established."  *Hangman Ridge Training Stables v. Safeco Title*

5    *Ins. Co.*, 719 P.2d 531, 539–40 (Wash. 1986) (en banc).  Similarly, a breach-of-

6    contract claim requires a showing of actual damages.  *DC Farms, LLC v. Conagra*

7    *Foods Lamb Weston, Inc.*, 317 P.3d 543, 553 (Wash. Ct. App. 2014).

8    Plaintiff advances a single theory of injury:  that some class members

9    incurred out-of-network costs because they saw out-of-network providers whose

10    services Coordinated Care (allegedly) should have covered.  *See* Mot. 28.  Her

11    three categories of CPA injury—"(1) improper claims denials, (2) overcharges at

12    out-of-network rates and/or (3) improper balance billing," Mot. 28—are all just

13    different phrasings of this same theory, which underlies the breach-of-contract

14    claim as well.  *See* Mot. 30.  Every class member, then, will face the individual

15    question whether they actually incurred and paid "improper charges" for out-of-

16    network care.  *Id.*

17    The proposed class definition, covering everyone who purchased an

18    Ambetter policy from Coordinated Care since 2012, makes no attempt to limit

19    class membership to those who were actually injured.  *See* Schexnaydre Decl.

1    ¶¶ 19, 47 (acknowledging that of 99,439 members, only 14,117 "may have"

2    received a balance bill).  Plaintiff recognizes the possibility that "some class

3    members did not incur improper charges," Mot. 28, but waves this barrier away,

4    arguing that "all class members were subjected and exposed to the same unlawful

5    conduct."  Mot. 28.  But courts routinely recognize that the presence of uninjured

6    class members will require the court to determine the individualized fact of injury

7    among the group, and thus Rule 23's predominance standards are not met.  *See,*

8    *e.g.*, *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 970 (S.D. Cal. 2016) (recognizing

9    that "a proposed class action requiring the court to determine the individualized

10   *fact* of damages does not meet the predominance standards of Rule 23(b)(3)"

11   (citation omitted)).

12          Plaintiff relies on *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir.

13   2016), for the proposition that "even a well-defined class may inevitably contain

14   some individuals who have suffered no harm as a result of a defendant's unlawful

15   conduct."  *Id.* at 1136.  But in *Torres*, the Ninth Circuit was addressing a broader

16   argument—that a class with uninjured members can never be certified.  *See id.*

17   The court did not hold that individualized questions of injury may never defeat

18   predominance on the facts of a particular case.  *See id.* at 1136-37.  Indeed, courts

19   since *Torres* have found predominance lacking where individual questions of

1    injury would overwhelm common questions regarding defendants' alleged

2    conduct.  *See, e.g.*, *Andrews v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 889,

3    892 (9th Cir. 2019) (distinguishing *Torres* as a case where "exposure to the alleged

4    misconduct was itself the injury" and holding predominance was defeated where

5    plaintiff's data showed many class members "likely were not injured"); *Lucas*, 212

6    F. Supp. 3d at 970.

7         *Torres* also recognized that "class membership must fit the theory of legal

8    liability," meaning the plaintiff's theory of injury must "actually map[] onto the

9    membership of the class."  835 F.3d at 1138.  Plaintiff's theory of injury in the

10   present case requires a showing of improper out-of-network costs, while her class

11   definition sweeps in *everyone* who bought an Ambetter policy from Coordinated

12   Care.  This poor fit between injury and class definition distinguishes this case from

13   *Torres*.

14        Determining whether any member of the proposed class has actually been

15   injured would involve a complex, fact-intensive, individualized inquiry.  The

16   factfinder would need to determine whether each class member actually was

17   treated by an out-of-network provider; whether that was because no in-network

18   provider was available; whether the member received a bill from the out-of-

19   network provider; whether the member paid the bill or the provider wrote off the

1    cost; and whether the member resolved the issue through Coordinated Care or the

2    OIC, *see supra* Section I.  Even if the member paid a cost for out-of-network care

3    because an in-network provider was unavailable, the jury would have to determine

4    what the member would have paid had they gone to an in-network provider,

5    including co-payments and deductibles, to determine whether there was actual

6    injury, and if so, the amount.[6]  Coordinated Care does this work each time a

7    member requests reimbursement of out-of-network costs; it would be burdensome

8    and inefficient for this Court to take on that task.

9         Because there are many reasons why a member may see an out-of-network

10   provider, the mere fact that a member went to an out-of-network provider does not

11   mean that the particular member incurred improper costs.  For this reason, the

12   insurance policy encourages members to contact Coordinated Care if they are

13   having difficulty finding an in-network provider so the issue can be addressed

14   before care is received, and it provides a simple procedure for members to recoup

15

16   _____

17   [6]  The Ambetter insurance policies have a deductible.  *See* Wendt Decl., Ex. 1 at 5,
     11 (insurance policy).  Except for certain preventative care, a member must pay for
18   care (whether in-network or out-of-network) until the deductible is met.  For many
     members, the deductible may mean that the member incurred no additional out-of-
19   pocket costs from seeing an out-of-network provider vis-à-vis an in-network
     provider.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 24
Case No. 2:18-CV-00012-SMJ

1    out-of-network costs that they believe are improper. *See* Wendt Decl., Ex. 1 at 12,

2    58 (insurance policy).

3         In sum, proof that a member incurred costs from an out-of-network doctor is

4    necessary, but not sufficient, to show that the costs were inappropriate and thus the

5    member was injured.  And Plaintiff's data analysis does not even reach the first

6    step of identifying members who incurred out-of-network charges from those who

7    did not.  Individual issues predominate in this case because determining liability

8    and damages for each member would require a "review of each class member's

9    medical, billing, and insurance records to determine whether each suffered an out-

10   of-pocket loss."  *Lucas*, 212 F. Supp. 3d at 970.

11        **B.    The question of causation is individualized.**

12        Both a CPA claim and a breach-of-contract claim require the plaintiff to

13   show not only that they suffered an injury, but also that the defendant's conduct

14   proximately caused the injury.  *Indoor Billboard/Wash., Inc. v. Integra Telecom of*

15   *Wash., Inc.*, 170 P.3d 10, 22 (Wash. 2007) (en banc) (CPA claim); *Nw. Indep.*

16   *Forest Mfrs. v. Dep't of Labor & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995)

17   (breach of contract claim).

18        Causation is an individualized issue in this case.  Whether Plaintiff's

19   argument is that (1) Coordinated Care violated the CPA or breached its contracts

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 25
Case No. 2:18-CV-00012-SMJ

1    with members by providing inadequate access to covered providers in certain

2    locations or for certain specialties, or (2) that Coordinated Care misrepresented its

3    provider network through an inaccurate directory, each class member would need

4    to individually show that a network problem or misstatement caused them to seek

5    out-of-network care.[7]  Those questions would require a mini-trial for every class

6    member and so defeat predominance.

7              **1.    Establishing a causal link between network issues and class**

8              **member's injury requires individualized showings.**

9          Plaintiff asserts that Coordinated Care caused members to incur out-of-

10    network costs by "failing to maintain an adequate provider network" in violation of

11    the CPA and its contracts.  Mot. 25, 29.  Every class member, then, must prove that

12

13    _____

      [7]  Plaintiff's motion also suggests a third theory of liability:  that Coordinated Care
14    violated the CPA by "fail[ing] to disclose that members are not responsible for
      charges by out-of-network providers over the members' cost-sharing amount
15    where there is a network inadequacy."  Mot. 25.  This theory does not appear in the
      Complaint, which relies only on the inadequate-network and inaccurate-directory
16    theories.  *See* TAC ¶¶ 42–49 (general allegations); *id.* ¶¶ 53–58 (allegations as to
      Plaintiff Harvey and putative class members).  Plaintiff may not seek certification
17    of a claim that is not in the Complaint.  *In re First Am. Home Buyers Prot. Corp.
      Class Action Litig.*, 313 F.R.D. 578, 609 (S.D. Cal. 2016).  Regardless, this theory
18    would not satisfy the predominance requirement due to the same individualized
      questions of reliance, injury, and damages discussed for Plaintiff's existing
19    theories—and it is undermined by the language in the insurance policy.  *See* Wendt
      Decl., Ex. 1 at 12 (insurance policy).

1    *but for* a network inadequacy, they would have seen an in-network provider *and*

2    paid less overall.  *See Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir.

3    2019) (recognizing that under *Comcast*, plaintiffs must link liability and damages

4    to secure class certification).

5         That is an individualized inquiry.  Even assuming that Plaintiff can prove

6    specific areas where certain specialties were not available in network, that showing

7    would not complete the chain of causation.  A patient may see an out-of-network

8    provider for any number of reasons apart from an insufficient number of in-

9    network providers within a reasonable distance.  For example, they may prefer to

10   see a certain doctor; they may have difficulty scheduling an appointment with an

11   in-network doctor, despite the adequacy of the network; a doctor may choose to

12   leave Coordinated Care's network; or the patient might just not check the

13   provider's network status.  Evaluating which of these and other possible reasons

14   may have led a member to obtain out-of-network care requires an inquiry into the

15   individual motivations and circumstances behind every visit to an out-of-network

16   provider.

17        Courts in this Circuit have frequently denied class certification on the

18   ground that individualized questions of causation would predominate over

19   common questions.  *See, e.g.*, *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 27
Case No. 2:18-CV-00012-SMJ

1    (9th Cir. 2004) (individual questions regarding causal link between alleged

2    misrepresentations and members' decision to gamble defeated predominance).

3    This is particularly true in the insurance context, given that there are often

4    legitimate reasons why a claim may be denied.  *See, e.g.*, *O'Dell v. Conseco Senior*

5    *Health Ins. Co.*, 2011 WL 13044240, at *7 (W.D. Wash. Feb. 10, 2011)

6    (recognizing that determining the reason why insurance company paid benefits at a

7    lower tier "would require a manual review of each claim file, resulting in mini-

8    trials for each class member"); *Campion v. Old Republic Home Prot. Co.*, 272

9    F.R.D. 517, 531 (S.D. Cal. 2011) (observing that even a "uniform policy that

10    encourages the wrongful denial of claims" would not establish classwide causation

11    because some claims are denied legitimately).  So too here.  There is no way to

12    prove, on a class-wide basis, which out-of-network costs incurred by Coordinated

13    Care members were caused by a lack of an in-network alternative.

14          **2.    Establishing a causal link between alleged misstatements**

15                **and class member's injury requires individualized**

16                **showings.**

17    Plaintiff contends that Coordinated Care violated the CPA by

18    "misrepresenting its actual provider network to consumers" in its directory of

19    providers and its marketing materials.  Mot. 25.  Plaintiff's theory would require

1    each class member to show that Coordinated Care's alleged misrepresentations

2    were the but-for cause of their decision to seek out-of-network care.  *Indoor*

3    *Billboard/Wash., Inc.*, 170 P.3d at 22.  This "fact-intensive, individual inquiry into

4    the motivations of each consumer," *Kelley v. Microsoft Corp.*, 2011 WL

5    13353905, at *3 (W.D. Wash. May 24, 2011), differs little in substance from a

6    traditional reliance analysis.

7         Courts routinely deny class certification in cases where the plaintiff's claim

8    requires a showing of reliance.  *See, e.g.*, *Mazza*, 666 F.3d at 596 (denying class

9    certification where some class members were never exposed to misleading

10   statements, and others learned allegedly omitted information before making

11   purchase); *Geier v. M-Qube Inc.*, 314 F.R.D. 692, 700–01 (W.D. Wash. 2016)

12   (denying class certification on Washington CPA claim); *O'Dell*, 2011 WL

13   13044240, at *8 (same).

14        Plaintiff tries to avoid this problem by suggesting that her misrepresentation

15   claim is "based on omissions."  Mot. at 29.   Not so.  Plaintiff's deception theory,

16   as pleaded in the Complaint, rests on alleged affirmative misrepresentations.

17   Specifically, Plaintiff alleges that Coordinated Care misstated the scope of its

18   network and the benefits of its Ambetter plans, TAC ¶¶ 42–46, and included

19   providers in its directory who did not actually belong in its network, *id.* ¶ 47.

1    Coordinated Care allegedly "omitted" only that its affirmative statements were

2    false.[8]  Such "mirror image" omissions claims do not pass muster.  *See Blough v.*

3    *Shea Homes, Inc.*, 2014 WL 3694231, at *13 (W.D. Wash. July 23, 2014).  The

4    Court should reach the same conclusion here.

5         **C.    The question of damages is individualized.**

6         Plaintiff concedes that the amount of each class member's damages—

7    separate from the question whether the class member suffered an injury—is an

8    individualized question.  Mot. 30–31.  She argues, though, that this does not

9    matter, because individualized damages questions cannot defeat predominance.  *Id.*

10   Plaintiff overlooks a crucial nuance.  Individual damages assessments do not defeat

11   predominance *if* "a valid method has been proposed for calculating those

12   damages."  *Nguyen*, 932 F.3d at 817 (quoting *Lambert v. Nutraceutical Corp.*, 870

13   F.3d 1170, 1182 (9th Cir. 2017)).  A class plaintiff must do more than propose an

14   arbitrary methodology; she must demonstrate that her methodology actually links

15

16

17   ———————————

     [8]  If Plaintiff instead contends the relevant omission is Coordinated Care's "failure
18   to disclose that it was required under Washington law to protect insureds from
     improper balance billing when its network was inadequate," Mot. at 29, the Court
19   should reject that theory on the grounds that it is not within the Complaint.  *Supra*
     note 7.

1   the defendant's alleged misconduct and class members' damages. *See Comcast*,

2   569 U.S. at 35–36.

3          Plaintiff has done no such thing. Her data analysis does not even claim to

4   calculate the out-of-network costs that class members incurred because an in-

5   network provider was not available, or even to identify which class members faced

6   an inadequate network of the particular type of provider that they needed at the

7   time and in their area. She thus offers no formula to calculate damages on a class-

8   wide basis as did the plaintiffs in *Nguyen*, 932 F.3d at 821, who sought damages

9   based on the average cost of repair for a defective part, or in *Pulaski & Middleman,*

10  *LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015), who sought damages based

11  on a straightforward discount ratio that the defendant already employed internally.

12         Here, no such formula or methodology exists because calculating each class

13  member's damages if any would involve an exhaustive case-by-case review. *See*

14  *Daniel F. v. Blue Shield of Calif.*, 305 F.R.D. 115, 131 (N.D. Cal. 2014) (rejecting

15  plaintiff's proposal of an "essentially mechanical process" for calculating damages

16  sustained by health insurance policyholders where "calculating damages would

17  require manual review of each claimant's records, as well as discovery on what

18  each claimant actually paid, what he/she still owes, [and] the nature of the services

19  provided"); *see also Flores v. Supervalu, Inc.*, 509 F. App'x 593, 594 (9th Cir.

1    2013) (denying class certification when questions of individualized behavior meant

2    plaintiff "could not prove the employer's liability through extrapolation from

3    statistics").  The individualized nature of damages here is yet another badge of a

4    lack of predominance.  Plaintiff has "made no attempt to explain how the court

5    could possibly try this case as a class action given the number of individual issues

6    involved." *Blue Shield*, 305 F.R.D. at 132.

7                            *          *          *

8            This case is unworkable as a class action.  For each request for

9    reimbursement of out-of-network costs, a detailed analysis of unique facts is

10   required.  The factfinder must examine the reason that care was sought from an

11   out-of-network provider, the availability of an in-network provider in the relevant

12   location and at the relevant time, the amount of any applicable deductible, and

13   more.  This work often involves sensitive medical issues and is necessary because

14   in some circumstances, the member is entitled to reimbursement; in others, the

15   member is not.  As a result, each request would require a mini-trial, and certifying

16   a class action would be counterproductive and unwieldy.  Moreover, class

17   members surely would receive less after legal fees than they would receive by

18   using one of the currently available methods of seeking reimbursement for out-of-

19

1   network costs, all of which are approved by the Office of the Insurance

2   Commissioner.

3   **<u>CONCLUSION</u>**

4        For the foregoing reasons, the Court should deny Plaintiffs' Motion for

5   Class Certification.

6   Dated:  February 19, 2020       Respectfully submitted,

7                          STOEL RIVES LLP

8                          By:  */s/ Maren R. Norton*

Maren R. Norton

9   600 University Street, Suite 3600

Seattle, WA  98101

10   Tel.:  206-624-0900

maren.norton@stoel.com

11

Brendan V. Sullivan, Jr. (admitted *Pro Hac*

12   *Vice*)

Steven M. Cady (admitted *Pro Hac Vice*)

13   WILLIAMS & CONNOLLY LLP

725 Twelfth Street, N.W.

14   Washington, D.C. 20005

Tel.: 202-434-5321

15   Fax: 202-434-5029

scady@wc.com

16

*Attorneys for Defendants*

17

18

19

<u>**CERTIFICATE OF SERVICE**</u>

1

2       I hereby certify that on February 19, 2020, I electronically filed the

3   foregoing with the Clerk of the Court using the CM/ECF System, which in turn

4   automatically sent a Notice of Electronic Filing to all parties in the case who are

5   registered users of the CM/ECF system.  The Notice of Electronic Filing for the

6   foregoing specifically identifies recipients of electronic notice.

7

8                          */s/ Maren R. Norton*
                           Maren R. Norton
9                          600 University Street, Suite 3600
                           Seattle, WA  98101
10                         Tel.:  206-624-0900
                           maren.norton@stoel.com

11

12

13

14

15

16

17

18

19

DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION - 34
Case No. 2:18-CV-00012-SMJ